JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

**09 CIV     9338**

YARON GISSIN, Individually and on Behalf  :
of All Those Similarly Situated,

  :

           Plaintiff,

  :

vs.

  :

DONALD L. ENDRES, DANNY C. HERRON :
AND BRYAN D. MEIER,

  :

           Defendants.

  :

————————————————————— x

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

2009 NOV 10  PM 2: 23

U.S. DISTRICT COURT

FILED

S.D. OF N.Y.

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by VeraSun Energy Corp. ("VeraSun" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of VeraSun between March 12, 2008 and September 16, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District and VeraSun's securities were traded on the New York Stock Exchange ("NYSE") during the Class Period, which is based in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Yaron Gissin, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of VeraSun during the Class Period and has been damaged thereby. Plaintiff Gissin resides in this District.

7.      VeraSun engages in the production and sale of ethanol and its co-products in the United States and is based in Sioux Falls, South Dakota. On October 31, 2008, VeraSun filed a voluntary petition for reorganization under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware and is not named as a defendant herein due to the mandatory stay under Section 362 of the U.S. Bankruptcy Code.

8.      (a)      Defendant Donald L. Endres ("Endres"), at all relevant times herein, served as Chairman of the Board, a director and Chief Executive Officer of VeraSun. Endres participated in the issuance of improper statements, including the preparation of press releases and SEC filings;

        (b)      Defendant Danny C. Herron ("Herron"), at all relevant times herein, served as Senior Vice President and Chief Financial Officer of VeraSun. Herron participated in the issuance of improper statements, including the preparation of press releases and SEC filings;

        (c)      Defendant Bryan D. Meier ("Meier"), at all relevant times herein, served as Vice President, Finance and Chief Accounting Officer of VeraSun. Meier participated in the issuance of improper statements, including the preparation of press releases and SEC filings.

        (d)      Defendants Endres, Herron and Meier are collectively referred to herein as the "Defendants."

9.      During the Class Period, Defendants, as senior executive officers and/or directors of VeraSun, were privy to confidential and proprietary information concerning VeraSun, its operations, finances, financial condition and present and future business prospects. Defendants also had access to material adverse non-public information concerning VeraSun, as discussed in detail below. Because of their positions with VeraSun, Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.     Defendants are liable as direct participants in the wrongs complained of herein. In addition, Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of VeraSun's business.

11.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

- 3 -

12.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to VeraSun's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of VeraSun common stock would be based upon truthful and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.    Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of VeraSun common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding VeraSun's business, operations and management and the intrinsic value of VeraSun common stock; and (ii) caused Plaintiff and members of the Class to purchase VeraSun common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of VeraSun between March 12, 2008 and September 16, 2008, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

- 4 -

15.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, VeraSun common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by VeraSun or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of VeraSun;

(c)    whether the price of VeraSun common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

- 5 -

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.    VeraSun describes itself as engaging in the production and sale of ethanol and its co-products in the United States. Founded in 2001, VeraSun is headquartered in Sioux Falls, South Dakota and is a leading producer and marketer of ethanol. Ethanol is a type of alcohol produced principally from corn that is used as a blend component in the U.S. gasoline fuel market to increase octane and reduce tailpipe emissions. Ethanol is mandated to go into the fuel stream by the federal government through the Renewable Fuel Standard (the "RFS"). The RFS calls for escalating volumes of ethanol to be purchased and blended into gasoline. By 2015, the RFS standards will require 15 billion gallons of ethanol a year. The Company also markets E85, a branded fuel blend consisting of 85% ethanol and 15% gasoline for use in "Flexible Fuel Vehicles."

21.    The Company's gross margin depends principally on the spread between ethanol and corn prices (the "Crush Spread"). Corn is the predominant feedstock used in ethanol production. However, corn prices do not necessarily correlate with the price of ethanol since each market is affected by unique supply and demand conditions. Factors affecting the grain markets, such as weather, crop conditions, and international trade, are distinct from those that affect ethanol, such as crude oil and gasoline supply and demand factors, the regulatory climate, and the availability of other fuel oxygenates.

22.    In early 2006, the Crush Spread was at historically high levels in excess of $2.50, driven in large part by oil companies removing a competitive product, MTBE, from the fuel stream

and replacing it with ethanol. However, the Crush Spread narrowed significantly throughout the fourth quarter of 2007 and 2008. After September 2007 and during the Class Period, Crush Spreads averaged less than $.50. Such sustained narrow Crush Spreads adversely affected the Company's results and created an incentive for Defendants to engage in speculative derivative transactions to improve the Company's financial performance.

23.     In its public statements, Defendants have continually told investors that they do not speculate on the price of corn or ethanol and that the only form of trading they may utilize would be for the sole purpose of minimizing risks and price fluctuations by "hedging commodity contracts." Furthermore, Defendants minimized the extent and impact of any hedging transactions. Unknown to investors, however, Defendants engaged in highly risky commodities transactions and speculated on their view of the future price of corn in hopes of reaping significant financial gain. Defendants never disclosed to investors that VeraSun, in addition to being an ethanol producer, was also engaged in substantial and risky commodity trades that exposed the Company to significant risks and financial devastation. In other words, Defendants never told investors that VeraSun was not just an ethanol producer, but also a commodities trading firm that was one bad trade away from bankruptcy.

24.     The Class Period begins on March 12, 2008. On that date, VeraSun issued a press release announcing its financial results for the fourth quarter and full year 2007, for the period ended December 31, 2007, and filed a Form 10-K with the SEC detailing its financial results (the "2007 Form 10-K"). The 2007 Form 10-K described the Company's pricing and hedging strategy:

> We seek to mitigate our exposure to commodity price fluctuations by purchasing forward a portion of our corn requirements on a fixed price basis and by purchasing corn and natural gas futures contracts. To mitigate ethanol price risk, we may sell a portion of our production forward under fixed price and indexed contracts. The indexed contracts are typically referenced to a futures contract such as unleaded gasoline on the New York Mercantile Exchange, or NYMEX, and we may hedge a portion of the price risk associated with index contracts by selling exchange-traded

- 7 -

unleaded gasoline contracts. We believe our strategy of managing exposure to commodity price fluctuations will reduce somewhat the volatility of our results.

As part of the ASA Acquisition, we acquired the Linden, Albion and Bloomingburg facilities subject to long-term agreements with Cargill, Incorporated ("Cargill") under which Cargill is responsible for supplying all corn and natural gas to the facilities and providing commodities risk management services. Generally, these agreements have ten year terms, except the corn supply agreement which has a twenty year term, and provide for the purchase and sale of commodities and products between the parties at market prices, and the payment of specified fees to Cargill.

*Corn procurement and hedging strategy.* We employ the following corn procurement methods and related hedging strategies:

• we purchase corn through spot cash, fixed-price forward and delayed pricing contracts; and

• we use hedging positions in the corn futures market to manage the risk of excessive corn price fluctuations for a portion of our corn requirements.

For our spot purchases, we post daily corn bids so that corn producers can sell to us on a spot basis. Our fixed-price forward contracts specify the amount of corn, the price and the time period over which the corn is to be delivered. These forward contracts are at fixed prices based on Chicago Board of Trade, or CBOT, prices. Our corn requirements can be contracted for up to a year in advance on fixed-price forward contracts. The parameters of these contracts are based on the local supply and demand situation and the seasonality of the price. For delayed pricing contracts, producers will deliver corn to the plant, but the pricing for that corn and the related payment will occur at a later date.

We may buy futures positions on the CBOT to hedge a portion of our exposure to corn price risk. In addition, our facilities have significant corn storage capacity. To help protect against potential supply disruptions, we generally maintain inventories of corn at each of our facilities. This corn inventory ranges generally from 10 to 30 days of supply, depending on the time of year, the current market price for corn and other factors.

25.    On May 12, 2008, VeraSun issued a press release announcing its financial results for the first quarter of 2008 ("1Q08"), the period ended March 31, 2008. In that regard, the press release announced that VeraSun's revenues increased 257% and earnings grew by $7.9 million for 1Q08. With respect to corn costs, the press release stated, in pertinent part:

Corn costs increased $154.0 million to $238.6 million for the three months ended March 31, 2008 compared with $84.6 million for the three months ended

- 8 -

March 31, 2007. Corn costs were $1.68 per manufactured gallon sold for the three months ending March 31, 2008, compared with $1.43 per gallon produced for the same period in 2007.

The increase in total corn costs for the three months ended March 31, 2008 was driven by $100.3 million of increased corn purchases resulting from additional production from our Charles City, Linden, and Albion facilities and $50.2 million of the increased corn costs resulted from higher corn prices per bushel.

26.    On May 12, 2008, VeraSun filed a Form 10-Q with the SEC and disclosed its

financial results for 1Q08. VeraSun's 1Q08 10-Q disclosed facts about the Company's use – or lack

thereof – of derivative instruments and hedging activities:

In March 2008, the FASB issued SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities." The new standard is intended to improve financial reporting about derivative instruments and hedging activities by requiring enhanced disclosures to enable investors to better understand their effects on an entity's financial position, financial performance, and cash flows. It is effective for financial statements issued for fiscal years and interim periods beginning after November 15, 2008, with early application encouraged. We do not expect the adoption of SFAS No. 161 to have a material impact on our consolidated financial statements. However, we are still in the process of evaluating the impact of adopting SFAS No. 161.

\*        \*        \*

The Company enters into various commodity derivative instruments, including forward contracts, futures, options, swaps and other over-the-counter agreements. The fair value of the Company's commodity derivatives is determined using unadjusted quoted prices for identical instruments on the applicable exchange in which VeraSun transacts. When quoted prices for identical instruments are not available, VeraSun uses forward price curves derived from market price quotations. Market price quotations are obtained from independent energy brokers, exchanges, direct communication with market participants and actual transactions executed by VeraSun. Market price quotations for certain inputs are generally readily obtainable for the applicable term of VeraSun's outstanding commodity derivative instruments, and therefore, VeraSun's forward price curves for those locations and periods reflect observable market quotes.

\*        \*        \*

A net gain of $4.4 million from derivatives was included in cost of goods sold for the three months ended March 31, 2008 compared to a net loss of $5.3 million for the three months ended March 31, 2007. The increase was due to mark-to-market adjustments related to our corn hedges.

- 9 -

27.    VeraSun's 1Q08 10-Q also detailed a sensitivity analysis to estimate the Company's exposure to market risk in corn and ethanol:

We have prepared a sensitivity analysis to estimate our exposure to market risk with respect to our corn and natural gas requirements, ethanol contracts and the related exchange-traded contracts for 2007.  Market risk related to these factors is estimated as the potential change in pre-tax income, resulting from a hypothetical 10% adverse change in the fair value of our corn and natural gas requirements and ethanol contracts (based on average prices for 2007) net of the corn and natural gas forward and futures contracts used to hedge our market risk with respect to our corn and natural gas requirements.  The results of this analysis are set forth in the following table.  Actual results may differ from these amounts due to various factors, including significant increases in the Company's production capacity during 2008.

| | Volume Requirements (In millions) | Units | Hypothetical Adverse Change in Price | | Change in Annual Pre-Tax Income (In millions) | |
|---|---|---|---|---|---|---|
| Ethanol | 353.1 | gallons | 10 | % | $ | (70.8 ) |
| Corn | 126.1 | bushels | 10 | | | (45.4 ) |
| Natural gas | 10.7 | MMBTU | 10 | | | (7.7 ) |

As of March 31, 2008, we had contracted forward on a fixed price basis the following quantities of corn and natural gas, which represent the indicated percentages of our estimated requirements for these inputs for the next twelve months:

| | Three months ending June 30, 2008 | | Three months ending September 30, 2008 | | Three months ending December 31, 2008 | | Three months ending March 31, 2009 | | Twelve months ending June 30, 2009 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Corn (thousands of bushels) | 9,162 | | 225 | | 1,861 | | 291 | | 11,539 | |
| Percentage of estimated requirements | 14.4 | % | 0.3 | % | 2.4 | % | 0.4 | % | 3.9 | % |
| Natural Gas (MMBTU) | — | | — | | — | | — | | — | |
| Percentage of estimated requirements | 0 | % | 0 | % | 0 | % | 0 | % | 0 | % |

28.    On May 13, 2008, VeraSun held a conference call with investors and reiterated its financial results set forth in its press release, discussed the Company's strategy in connection with hedging and other speculative transactions involving corn, and told investors that the Company did not have any significant hedging exposure:

**Scott Reynolds – *Thomas Weisel Partners – Analyst***

Okay.  Also on the corn, you are still not significantly hedged heading into the second quarter?

- 10 -

**Don Endres – *VeraSun Energy Corporation – CEO***

That is right. Our view has been that because there is not a forward opportunity to fixed-price ethanol that we're keeping our book balanced and keeping corn on a spot basis as well.

29.     In addition to falsely stating that the Company was not significantly hedged on corn, Endres' statement indicated that the Company had not – and would not – enter into any "price-fixed" contracts for corn since the commensurate transactional equivalent, a "price-fixed" delivery contract for ethanol, was not available.

30.     On June 2, 2008, VeraSun issued a press release titled "VeraSun Energy Closes $125 Million Revolving Credit Facility" and announced that it entered into a new revolving credit facility with UBS Investment Bank and that "VeraSun intends to use proceeds from the facility for general corporate purposes." "As previously announced, this credit facility will provide additional liquidity sources to support our accelerated growth," said Defendant Herron.

31.     On June 12, 2008, Defendant Herron presented at William Blair & Company's 28th Annual Growth Stock Conference and this presentation was made available on VeraSun's website. On June 23, 2008, William Blair & Company issued a research report on VeraSun summarizing Defendant Herron's presentation. This report commented on the fact that corn prices had risen to above $7 per bushel and the pressure that would put on the Company's margins. Defendant Herron failed to disclose at the conference that the Company had placed a huge gamble on a decline in the price of corn and that the increase in corn prices resulted in a large paper loss to the Company, creating margin pressure.

32.     On August 11, 2008, VeraSun issued a press release titled "VeraSun Reports Record Revenues for Second Quarter 2008 – Revenues Exceed One Billion Dollars and EBITDA More than Doubles over Q2 2007" and announced its financial results for the second quarter of 2008 ("2Q08"), the period ended June 30, 2008. In that regard, the press release announced that VeraSun's revenues

- 11 -

increased 499% over 2Q08 to $1.015 billion, and generated earnings of $.15 per diluted share. This press release did not disclose the speculative trades employed by the Company with respect to the price of corn.

33.    On August 11, 2008, VeraSun filed a Form 10-Q with the SEC and disclosed its financial results for 2Q08. VeraSun's 2Q08 10-Q disclosed facts about the Company's use – or lack thereof – of derivative instruments and hedging activities:

> In March 2008, the FASB issued SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities." The new standard is intended to improve financial reporting about derivative instruments and hedging activities by requiring enhanced disclosures to enable investors to better understand their effects on an entity's financial position, financial performance, and cash flows. It is effective for financial statements issued for fiscal years and interim periods beginning after November 15, 2008, with early application encouraged. We do not expect the adoption of SFAS No. 161 to have a material impact on our consolidated financial statements. However, we are still in the process of evaluating the impact of adopting SFAS No. 161.

> \*        \*        \*

> The Company enters into various commodity derivative instruments, including forward contracts, futures, options, swaps and other over-the-counter agreements. The fair value of the Company's commodity derivatives is determined using unadjusted quoted prices for identical instruments on the applicable exchange in which VeraSun transacts. When quoted prices for identical instruments are not available, VeraSun uses forward price curves derived from market price quotations. Market price quotations are obtained from independent energy brokers, exchanges, direct communication with market participants and actual transactions executed by VeraSun. This methodology also applies to those derivative contract commitments which were made by US BioEnergy prior to the April 1 2008 merger with VeraSun. Market price quotations for certain inputs are generally readily obtainable for the applicable term of VeraSun's outstanding commodity derivative instruments and, therefore, VeraSun's forward price curves for those locations and periods reflect observable market quotes.

> \*        \*        \*

34.    The 2Q08 10-Q stated that VeraSun did not use derivative instruments for speculative or trading purposes:

- 12 -

Market risk is the potential economic loss that may result from adverse changes in the fair value of financial instruments. VeraSun is exposed to market risk from changes in both commodity prices and interest rates. VeraSun monitors its exposure to commodity risks and attempts to manage these risks by hedging commodity contracts. *VeraSun does not use derivative instruments for speculative or trading purposes. VeraSun's broad-based business activities help to reduce the impact that volatility in any particular area or related areas may have on its operating earnings as a whole.* VeraSun's management takes an active role in the risk management process and has developed policies and procedures that require specific administrative and business functions to assist in the identification, assessment and control of various risks.

[Emphasis added.]

35.     The 2Q08 10-Q described the impact of the price of corn and derivative trading relating to corn on the Company's financial performance:

Cost of goods sold and gross profit. Our gross profit is derived from our total revenues less our cost of goods sold. *Our cost of goods sold is mainly affected by the cost of corn, natural gas and transportation and the purchase price of ethanol from other producers. Corn is our most significant raw material production cost (excluding the cost of ethanol purchases).* The price of corn is influenced by weather conditions and other factors affecting crop yields, farmer planting decisions and general economic, market and regulatory factors. These factors include government policies and subsidies with respect to agriculture and international trade, and global and local demand and supply. The spot price of corn tends to rise during the spring planting season and tends to decrease during the fall harvest. We purchase natural gas to power steam generation in our ethanol production process and to dry our distillers grains. Natural gas represents our second largest production cost (excluding the cost of ethanol purchases). *Cost of goods sold also includes the net gain or loss from derivatives relating to corn and natural gas, and the cost of ethanol that we purchase for resale. Transportation expense represents the third major component of our cost of goods sold (excluding the cost of ethanol purchases).* Transportation expense includes rail car leases, freight and shipping of our ethanol and distillers grains, as well as costs incurred in storing ethanol at destination terminals.

*           *           *

*Cost of goods sold and gross profit.* Corn costs increased $413.7 million, or 506.5%, to $495.4 million for the three months ended June 30, 2008 compared with $81.7 million for the three months ended June 30, 2007. If the corn sales of $26.5 million are netted with corn costs, the total corn costs for the quarter would have been $469.0 million, an increase of $387.3 million or 474.1% over the same period in 2007.

- 13 -

Corn costs (net of corn sales) were $5.37 per bushel or $1.90 per manufactured gallon sold for the three months ending June 30, 2008, compared with $3.62 per bushel or $1.29 per manufactured gallon sold for the same period in 2007.

The increase in total corn costs (net of corn sales) for the three months ended June 30, 2008 was driven by $236.2 million of increased corn purchases resulting from additional production from the Linden, Albion, and Bloomingburg facilities, which came on line since June 30, 2007, and the US BioEnergy facilities acquired April 1, 2008, and $151.1 million of the increased corn costs resulted from higher corn prices per bushel.

A net gain of $25.6 million from derivatives was included in cost of goods sold for the three months ended June 30, 2008 compared to a net gain of $4.9 million for the three months ended June 30, 2007. The increase was due to mark-to-market adjustments related to our corn hedges.

[Emphasis added.]

36.    The 2Q08 10-Q reported the fair values of the Company's derivative investments:

The following table presents the fair value hierarchy for those assets and liabilities measured at fair value on a recurring basis as of June 30, 2008. As required by SFAS No. 157, financial assets and liabilities are classified in their entirety based on the lowest level of input that is significant to the fair value measurement. The Company's assessment of the significance of a particular input to the fair value measurement requires judgment and may affect the valuation of fair value assets and liabilities and their placement within the fair value hierarchy levels.

| | Fair value as of June 30, 2008 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Derivatives (current) | $ 14,671 | 49,562 | — | $ 64,233 |
| Derivatives (long-term) * | — | 6,205 | — | 6,205 |
| Total | $ 14,671 | 55,767 | — | $ 70,438 |
| Liabilities: | | | | |
| Derivatives (current) | $ 37,742 | 3,965 | — | $ 41,707 |
| Derivatives (long-term) * | 5,234 | — | — | 5,234 |
| Total | $ 42,976 | 3,965 | — | $ 46,941 |

*Long-term derivatives assets and liabilities are included in other long-term assets and other long-term liabilities, respectively, based on their contractual maturities.

37.    The 2Q08 10-Q described the strong liquidity position of the Company:

Based on current market conditions, we believe that our existing sources of capital will be sufficient to fund anticipated working capital requirements, capital expenditures and cash required for other activities for at least the next 12 months.

38.     On August 12, 2008, VeraSun held a conference call with analysts to discuss the

Company's financial results for 2Q08 and prospects going forward. Defendant Meier provided

guidance for VeraSun's third quarter 2008:

> Now I would like to give you guidance for the third quarter which is based on
> our current view of the market. We expect to ship between 350 and 375 million
> gallons. Included in those numbers are 50 to 60 million gallons of purchase resale
> gallons. Selling price will be between $2.40 and $2.65 per gallon, and with the corn
> cost of between $5.90 and $6.15 per bushel. Given the current market for corn, this
> seems high but during the second quarter, we recorded a mark-to-market gain of
> $25.6 million which will reverse in the third quarter. I would also like to remind you
> that as our plants that were under construction are completed, interest that was
> previously capitalized as part of the construction project will now be included in
> interest expense on the income statement.

Unknown to investors, at the time of the above forecasts, VeraSun had entered into "accumulator

contracts" and was required to purchase increasing amounts of corn as the price declined. This

caused VeraSun's cost per bushel to be much higher than forecasted and the Company was required

to purchase more corn than forecasted. Accordingly, Defendants had no reasonable basis to report

the forecasts on the August 12, 2008 conference call.

39.     On the August 12, 2008 conference call, Defendant Herron stated: "I'd like to

reiterate what Don said about it being a strong quarter for VeraSun. Our team executed well across

all areas."

40.     The statements referenced above in ¶¶24-39 were materially false and misleading

when made because they misrepresented and failed to disclose the following adverse facts, which

were known to Defendants or recklessly disregarded by them:

        (a)     VeraSun was, in part, a speculative commodities trader in addition to an

ethanol producer;

        (b)     VeraSun engaged in speculative and risky derivate transactions that exposed

the Company to substantial financial and liquidity risk;

- 15 -

(c)     VeraSun experienced substantial loses on speculative derivative transactions causing margin pressures on the Company;

(d)     as a result of margin pressures from bad speculative derivative transactions, the Company sold out of a large short position in corn and incurred substantial losses;

(e)     the Company entered into highly risky "accumulator" contracts that obligated VeraSun to purchase increasing amounts of corn after the price of corn fell in price per bushel; and

(f)     VeraSun's financial condition and especially its liquidity were negatively impacted as a result of speculative commodity transactions, ultimately causing the Company to file for bankruptcy

41.     On September 16, 2008, VeraSun announced that it commenced a public offering of 20 million shares of its common stock to raise money for "general corporate purposes." The true purpose of this offering was to raise capital in an effort to prevent a disastrous impact from the huge losses experienced by the Company as a result of its speculative trading and risky bets on the price of corn.

42.     Also on September 16, 2008, the Company filed a Form 8-K detailing the following "recent developments":

> We historically have employed short financial positions to hedge our physical purchases of corn. In July 2008, after corn prices had risen from approximately $6.00 per bushel at the end of May 2008 to almost $8.00 per bushel due to extraordinary weather conditions in the Midwest and broader commodity market trends, we chose to exit our short financial positions in corn to mitigate what we considered to be unacceptable margin exposure in our futures positions. Upon termination of these short financial positions, we effectively priced our corresponding physical purchases of corn at the then-current market price, which proved to be significantly higher than today's market prices for corn. In addition, based on market forecasts that corn prices would continue to rise, we entered into a number of "accumulator" contracts relative to corn requirements for the third and fourth quarters that, in each case, allowed us to purchase a specified volume of corn at prices below then-prevailing market rates, but also required us to purchase that same volume of corn (in addition to the initial purchase) at one or more lower prices

- 16 -

per bushel should market prices decline to or below those lower levels over the duration of the contract. Shortly thereafter, corn prices commenced a sharp decline from almost $8.00 per bushel to a low of under $5.00 per bushel in mid-August 2008. As a result, we were required under the accumulator contracts to purchase additional amounts of corn at prices that proved to be higher than prevailing market prices. As a result of these various hedge positions, as well as the difficult operating environment, we expect to record average corn prices of between $6.75 and $7.00 per bushel during the third quarter of 2008.

43.    In response to the Company's announcements on September 16, 2008, on September 17, 2008, shares of the Company's stock fell $3.81 per share, or 70%, from a close of $5.22 per share before the announcement, to close at $1.41 per share, on extremely heavy trading volume. This closing price of $1.41 was the lowest the Company's stock had been since its inception and down 83% from the Class Period-high of $8.16 per share on August 13, 2008.

44.    Thereafter, VeraSun's shares continued to decline due to increasing liquidity problems faced by the Company as a result of its undisclosed speculative derivative transactions. On October 31, 2008, VeraSun filed for Chapter 11 bankruptcy protection.

45.    The market for VeraSun common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, VeraSun common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired VeraSun common stock relying upon the integrity of the market price of VeraSun common stock and market information relating to VeraSun, and have been damaged thereby.

46.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of VeraSun common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

47. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about VeraSun's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of VeraSun and its business, prospects and operations, thus causing the price of VeraSun common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegations

48. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding VeraSun, their control over, and/or receipt and/or modification of VeraSun's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning VeraSun, participated in the fraudulent scheme alleged herein.

- 18 -

## Loss Causation/Economic Loss

49.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of VeraSun common stock and operated as a fraud or deceit on Class Period purchasers of VeraSun common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of VeraSun common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of VeraSun common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

50.     Defendants' false and misleading statements had the intended effect and caused VeraSun common stock to trade at artificially inflated levels throughout the Class Period.

51.     As a direct result of Defendants' disclosures set forth above, the price of VeraSun common stock fell precipitously. These drops removed the inflation from the price of VeraSun common stock, causing real economic loss to investors who had purchased VeraSun common stock during the Class Period.

52.     The declines in the price of VeraSun common stock after the disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines in VeraSun common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of VeraSun common stock and the subsequent significant decline in the value of VeraSun common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

- 19 -

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

53.     At all relevant times, the market for VeraSun common stock was an efficient market

for the following reasons, among others:

(a)     VeraSun common stock met the requirements for listing, and was listed and

actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, VeraSun filed periodic public reports with the SEC and

the NYSE;

(c)     VeraSun regularly communicated with public investors via established market

communication mechanisms, including regular disseminations of press releases on the national

circuits of major newswire services and other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

(d)     VeraSun was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms. Each of these reports was publicly available and entered the public

marketplace.

54.     As a result of the foregoing, the market for VeraSun common stock promptly digested

current information regarding VeraSun from all publicly available sources and reflected such

information in the prices of the stock. Under these circumstances, all purchasers of VeraSun

common stock during the Class Period suffered similar injury through their purchase of VeraSun

common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

55.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of VeraSun who knew that those statements were false when made.

### COUNT I

#### Violation of Section 10(b) of the Exchange Act
#### and Rule 10b-5 Promulgated Thereunder
#### Against All Defendants

56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

59.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for VeraSun common stock. Plaintiff and the Class would not have purchased VeraSun common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of VeraSun common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     Defendants acted as controlling persons of VeraSun within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of VeraSun, and their ownership of VeraSun stock, Defendants had the power and authority to cause VeraSun to engage in the wrongful conduct complained of herein. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  November 10, 2009                    COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                             SAMUEL H. RUDMAN
                                             DAVID A. ROSENFELD
                                             EVAN J. KAUFMAN


                                             _____
                                                  SAMUEL H. RUDMAN

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)

                                             HOLZER HOLZER & FISTEL, LLC
                                             MICHAEL I. FISTEL, JR.
                                             200 Ashford Center North, Suite 300
                                             Atlanta, Georgia 30338
                                             Telephone: 770/392-0090
                                             770/392-0029 (fax)

                                             DYER & BERENS LLP
                                             JEFFREY A. BERENS
                                             682 Grant Street
                                             Denver, CO  802303
                                             Telephone:  303/861-1764
                                             303/395-0393 (fax)

                                             *Counsel for Plaintiff*

- 23 -

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**
The undersigned declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4. Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| VSE (Verasun) | 07/08/08 | 1000 | $4150 |
| VSE (Verasun) | 06/30/08 | 2000 | $8880 |
| VSE (Verasun) | 05/13/08 | 2000 | $12,200 |

Sales:
Name of Company Date(s) Sold # Shares Sold Proceeds
VSE

5. During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
I declare under penalty of perjury that the foregoing is true and correct.
Executed this *7th* day of November_____, 2009 in __*New York, NY*_____,

(Signature) X_____