# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| YARON GISSIN, Individually and on Behalf of All Those Similarly Situated, | : | Civil Action No. 1:09-cv-09338-SAS |
|  | : | **CONSOLIDATED CLASS ACTION** |
|  | : | **COMPLAINT FOR VIOLATIONS OF** |
| Plaintiff, | : | **THE FEDERAL SECURITIES LAWS** |
|  | : |  |
| vs. | : | **JURY TRIAL DEMANDED** |
|  | : |  |
| DONALD L. ENDRES, DANNY C. HERRON AND BRYAN D. MEIER, | : | **ECF CASE** |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
|  | : |  |



#122234

Lead Plaintiffs Wayne Mitchell and Son Nguyen ("Plaintiffs"), through their attorneys, bring this action on behalf of themselves and all others similarly situated, and allege as follows. The allegations herein are based on personal knowledge of the Plaintiffs as to their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia*, the investigation of Plaintiffs' counsel. This investigation has included a review of: (1) public filings made with the Securities and Exchange Commission ("SEC") by VeraSun Energy Corporation ("VeraSun" or the "Company"); (2) the pleadings and papers on file in VeraSun's Chapter 11 bankruptcy case pending in the U.S. Bankruptcy Court for the District of Delaware, *In re VeraSun Energy Corporation, et al.*, Case No. 08-12606 (BLS); (3) securities analyst reports regarding VeraSun; (4) transcripts of quarterly earnings conference calls with VeraSun management; (5) publicly available trading information regarding VeraSun's securities; (6) articles in the general and financial press; and (7) detailed interviews with numerous confidential witnesses, including former VeraSun employees and other persons with knowledge of Defendants' conduct during the Class Period. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND OVERVIEW

1.    This is a federal securities class action on behalf of those who purchased or otherwise acquired the common stock of VeraSun from March 12, 2008 through September 16, 2008 (the "Class Period") and were damaged as a result of Defendants' false and misleading statements concerning the Company's liquidity that artificially inflated the price of the Company's stock.

2.    VeraSun was one of the largest and fastest-growing ethanol producers in the

United States.  In early 2008, Defendants presented VeraSun as a robust company, with more than $150 million in cash on its balance sheet at the end of Fiscal Year 2007.  In fact, for the quarter ended June 30, 2008, VeraSun announced record revenues totaling more than $1 billion and significant earnings.  Despite this apparent success, the Company's cash position suddenly and inexplicably declined to just $9 million by the end of the third quarter of 2008 ("Q3 2008").  By the end of October 2008, the once "rising star" in the renewable fuel industry was insolvent.

3.      The demise of VeraSun began as a result of VeraSun's attempts to expand simultaneously through the opening of ethanol refineries and the acquisition of US BioEnergy Corporation ("US BioEnergy").  As a result of this acquisition, VeraSun took on three additional ethanol refineries that were under construction or in development.  Combined with VeraSun's existing refineries already in the build-out stage, the Company now had six facilities across the Midwest that it was trying to start simultaneously.

4.      The tremendous amounts of cash needed to build these new facilities quickly placed the Company in a precarious liquidity position.  Yet in March and April 2008, while liquidity problems were becoming evident to the Defendants, the Defendants repeatedly assured investors that the Company's liquidity was strong and that the Company had "liquidity flexibility to continue to run our business and grow [the] business."

5.      In May 2008, in order to mask the growing liquidity problems, the Company secured a $125 million credit facility.  Unbeknownst to investors, however, the $125 million credit facility was not an insurance policy for **potential** liquidity problems as the Company suggested; rather, it was a cash lifeline necessary to sustain VeraSun's rapid expansion and high overhead due to the construction and development of the refineries.

6.      With liquidity problems continuing to grow in early June of 2008, the Company

was facing another potentially devastating liquidity issue when the price of corn, the main

ingredient in ethanol, skyrocketed to almost $8.00 per bushel due to poor weather conditions in

the Midwest, among other factors. The high corn prices made it necessary for the Company to

exit its short positions in corn (which required a margin balance) in July 2008 and enter into

risky derivative corn "accumulator contracts," shortly thereafter, which required little or no cash

up front, but created tremendous financial exposure.

7. An accumulator contract is a high-risk financial instrument that obligates an

investor to purchase a security, currency or commodity at a fixed price – often set at a discount

to prevailing market rates – at regular intervals going forward. When the market price is above

the fixed purchase price, the investor makes money. When it falls below the fixed price, the

investor may sustain much larger losses.

8. Through the accumulator contracts, VeraSun was obligated to purchase corn at

an average price of between $6.50 and $7.00 per bushel. In July and August of 2008, corn prices

declined sharply from almost $8.00 per bushel to nearly $5.00 per bushel. VeraSun's

accumulator contracts required that the Company purchase twice as much corn as it would have

otherwise purchased, at above-market prices. In essence, VeraSun made a high stakes bet and

lost, with devastating consequences. It incurred a loss of running into the tens of millions of

dollars based on the accumulator contracts. Unbeknownst to investors, this risky hedging

strategy not only failed, but greatly exacerbated the Company's precarious cash position.

9. In early August 2008, against the backdrop of its risk management failures,

Defendants continued to fraudulently represent to the Company's shareholders and the market

that VeraSun's liquidity was sound and that the Company was sufficiently funded to operate for

at least the next twelve months. Defendants also publicly downplayed the risk of the high corn

prices, falsely assuring investors that corn prices would have a minimal impact on the Company.

10.    On August 14, 2008, the Company announced that it had commenced a secondary public offering for $750,000,000. The true purpose of this offering was an attempt to quickly cover the losses from its speculative trading and risky bets on the price of corn.

11.    Unable to scrape together enough capital to pay its mounting debts, the Company quickly abandoned the idea of a secondary public offering. As a result, Defendants could no longer hide VeraSun's cash crisis. On September 16, 2008, only **one month** after Defendants had assured investors its liquidity was "strong", the Company finally admitted that it was suffering a cash shortage and expected to take an estimated loss of at least $63 to $103 million in Q3 2008. As a result of these disclosures, the Company's stock price plunged 70% the following day, closing at just $1.41 per share, causing damage to shareholders who bought during the Class Period.

12.    Six weeks later, on October 31, 2008, VeraSun filed for Chapter 11 bankruptcy protection. Then, on November 19, 2008, VeraSun announced a staggering **$476 million loss** for the three month period ended September 30, 2008. As a part of the loss, VeraSun also identified corn-related derivative losses of $119 million.

<u>**JURISDICTION AND VENUE**</u>

13.    The claims asserted herein arise under and are brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. §1391(b).  Many of the acts complained of herein occurred within this District.  In addition, VeraSun's securities traded on the New York Stock Exchange ("NYSE") during the Class Period, which is based in this District.

16.    In connection with the acts, conduct, and other wrongs alleged in this Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"), Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

### A.    Plaintiffs

17.    Lead Plaintiff Wayne Mitchell purchased or otherwise acquired the common stock of VeraSun during the Class Period and sustained damages as a result of the violations of law alleged herein, as set forth in the certification attached hereto.

18.    Lead Plaintiff Son Nguyen purchased or otherwise acquired the common stock of VeraSun during the Class Period and sustained damages as a result of the violations of law alleged herein, as set forth in the certification attached hereto.

### B.    Unnamed Defendant

19.    VeraSun produces ethanol and ethanol-related products.  The Company is based in Sioux Falls, South Dakota.  On October 31, 2008, VeraSun and 24 of its subsidiaries filed a voluntary petition for reorganization under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware, *In re VeraSun Energy Corporation, et al.*, Case No. 08-12606 (BLS).  As a result of the VeraSun bankruptcy and the automatic stay provisions of 11 U.S.C. §362(a), VeraSun is not named as a defendant in this action.

C.    **Defendants**

20.    Defendant Donald L. Endres ("Endres") was Chairman of the Board, a Director, and Chief Executive Officer of VeraSun. During the Class Period, Endres signed the following SEC filings: (i) Form 10-K for Fiscal Year 2007, filed on March 12, 2008 (the "2007 10-K"); (ii) Form 10-Q for first quarter 2008, filed on May 12, 2008 (the "1Q08 10-Q"); and (iii) Form 10-Q for second quarter 2008, filed on August 11, 2008 (the "2Q08 10-Q"); and (iv) Form S-3, filed on August 14, 2008 (the "Form S-3"). In addition, Endres participated in the issuance of improper statements, including the preparation of press releases, identified below.

21.    Defendant Danny C. Herron ("Herron") was a Senior Vice President and Chief Financial Officer ("CFO") of VeraSun. During the Class Period, Herron signed the following SEC filings: (i) the 2007 10-K; (ii) Form 8-K, filed on April 1, 2008 (the "April 1, 2008 8-K"); (iii) the 1Q08 10-Q; (iv) the 2Q08 10-Q; and (iv) the Form S-3/A. In addition, Herron participated in the issuance of improper statements, including the preparation of press releases, identified below.

22.    Defendant Bryan D. Meier ("Meier") was Vice President, Finance and Chief Accounting Officer of VeraSun. During the Class Period, Meier signed the following SEC filings: (i)  the 2007 10-K; and (ii) Form 8-K, filed on September 16, 2008 (the "September 16, 2008 8-K"). In addition, Meier participated in the issuance of improper statements, including the preparation of press releases, identified below.

## CLASS ACTION ALLEGATIONS

23.    Plaintiffs brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on their own behalf and on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired VeraSun common stock from March 12, 2008

through September 16, 2008 and were damaged thereby (the "Class").

24.     Excluded from the Class are the Defendants, officers and directors of VeraSun, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which an excluded entity has or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, VeraSun common stock was actively traded on the New York Stock Exchange ("NYSE"), an efficient market, under the symbol "VSE".  While the exact number of Class members is unknown to the Plaintiffs at this time and can only be ascertained through appropriate discovery, the Plaintiffs believe that there are hundreds or thousands of Class members who are geographically dispersed.  Class members can be identified through records maintained by VeraSun or its transfer agent.  They can be notified of the pendency of this action by mail and through the Internet, using a form of notice similar to that customarily used in securities class actions.

26.     Plaintiffs' claims are typical of those of the other Class members. All Class members were similarly affected by Defendants' wrongful conduct in violation of federal securities laws as alleged herein.  The Plaintiffs and all Class members have purchased or otherwise acquired VeraSun common stock during the Class Period and have sustained damages arising out of the Defendants' wrongful conduct.

27.     Plaintiffs will zealously prosecute the claims and will fairly and adequately protect the interests of the Class members.  Plaintiffs have retained counsel competent and experienced in class action and securities litigation.  Plaintiffs do not have interests antagonistic to, or in conflict with, the other members of the Class.

28.     Common questions of law and fact exist as to all members of the Class and such

questions predominate over any questions affecting individual Class members.  Among the common questions of law and fact are the following:

(a)     Whether the Defendants violated the federal securities laws through their acts and/or omissions, as alleged herein;

(b)     Whether the Defendants directly or indirectly participated in and pursued the fraudulent scheme and common course of conduct, as alleged herein;

(c)     Whether the filings, reports, documents, statements, and attestations made by the Defendants during the Class Period omitted or misrepresented material facts about the business, operations, performance, and/or financial condition of VeraSun;

(d)     Whether the public statements issued by VeraSun and the Defendants, including VeraSun's filings with the SEC, contained material misrepresentations and/or omitted to state material facts;

(e)     Whether the Defendants acted knowingly or with reckless disregard for the truth in misrepresenting and/or omitting material facts in committing the wrongful acts alleged herein;

(f)     Whether the market price for VeraSun common stock was manipulated or artificially inflated during the Class Period due to the misrepresentations and/or omissions complained of herein; and

(g)     Whether the Plaintiffs and the other Class members have sustained damages and, if so, the proper measure of such damages.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the

expense and burden of individual litigation make it impossible for Class members to individually

redress the wrongs complained of herein.  There will be no difficulty in the management of this

action as a class action.

## SUBSTANTIVE ALLEGATIONS

### A.    VeraSun's Ethanol Operations

30.    VeraSun was founded in 2001 and is headquartered in Sioux Falls, South Dakota.

VeraSun was one of the largest ethanol producers in the United States.  At one time, it had 17

production plants located in Indiana, Iowa, Michigan, Minnesota, Nebraska, North Dakota,

South Dakota and Ohio.  Many of these plants were added through the acquisitions of ASA

OpCo Holdings, LLC ("ASA") in 2007 and US BioEnergy in 2008.

31.    Ethanol is used in gasoline to increase octane and reduce emissions. Ethanol is an

alcohol produced from corn, with one bushel of corn yielding approximately 2.8 gallons of

ethanol.  The process for turning corn into ethanol generally starts with grinding the corn into

flour or "meal."  Water is added and the meal is cooked to form a slurry called "mash."  Heat

from the cooking process liquefies the starch in the corn.  Enzymes are used to break down the

starch into fermentable sugar and then yeast is added, which turns the sugars into ethanol.  The

ethanol is sold to refineries for use in fuel products, while the non-fermentable material is sold

for use in animal feed.

32.    The ethanol industry has grown significantly in recent years, with a compounded

annual growth rate of 22% from 2000 to 2007.  The industry is likely to continue growing

because of ethanol's cleaner burning characteristics, the shortage of petroleum refining capacity

in the United States and new laws requiring the use of renewable fuels.

33.    On June 14, 2006, VeraSun became the first "pure play" ethanol producer to take

its stock public when it listed on the NYSE. The Initial Public Offering was the first of several major announcements for the Company over the next 18 months. In July 2007, VeraSun announced its first major acquisition in the industry when the Company purchased ASA and acquired three production facilities. The facilities, located in Indiana, Nebraska, and Ohio, doubled VeraSun's production capacity.

34.    Just four months later, in November 2007, VeraSun announced that it was acquiring US BioEnergy.

**B.    The US BioEnergy Acquisition and VeraSun's Rapid Expansion**

35.    On March 12, 2008, VeraSun issued a press release announcing its financial results for the fourth quarter and full year 2007, for the period ending December 31, 2007 and filed the 2007 10-K. The 2007 10-K reported that on November 29, 2007, VeraSun and US BioEnergy entered into a merger agreement. Under the terms of the merger agreement, 0.81 shares of VeraSun stock would be issued for each outstanding share of US BioEnergy. The deal was valued at approximately $700 million. Under the terms of the agreement, VeraSun would acquire US BioEnergy's debt of approximately $525 million.

36.    On April 1, 2008, VeraSun filed the April 1, 2008 8-K with the SEC announcing the completion of the US BioEnergy acquisition. The acquisition added eight ethanol refineries to VeraSun's operations, three of which were under construction. In the Company's press release attached to the 8-K, Defendant Endres touted the benefits of the combined company, claiming that:

> We look forward to realizing the synergies of our combined business as we expect to reach 16 biorefineries and an operating capacity of more than 1.6 billion gallons by the end of 2008. The size and scale that results from this merger will allow us to become more relevant to our customers in the petroleum industry and continue to position VeraSun as a premiere platform company in

the renewable fuels industry.

37.    During an interview with Environment and Energy News TV, Defendant Endres

claimed the merger added production facilities and value to VeraSun's operations.  Specifically,

Endres stated:

> …combined, we will have 1.64 billion gallons of production capacity by
> the end of the year.  This quarter we're bringing up three facilities, another
> 330 million gallons.  So, [the merger is] going to significantly increase
> size and scale… As we increase our size we reduced our cost on a per
> gallon basis.  We can use [the] best of best operating practices, so there's a
> number of benefits of the merger.  We're very excited.  We have it
> complete and we're working at integration.

38.    On June 19, 2008, Defendant Herron presented at William Blair & Company's

28th Annual Growth Stock Conference and this presentation was made available on VeraSun's

website.  The presentation touted VeraSun's "accelerated growth" and noted that VeraSun was

poised to grow 613% in production capacity from 14 new operating facilities in two years.

39.    According to VeraSun's 2Q08 10-Q, during the first half of 2008, at least six

refineries, including those acquired through the US BioEnergy merger and purchase of ASA,

were under construction. The refineries were located in Iowa, Minnesota, and Ohio.  VeraSun's

Aurora, South Dakota corn oil extraction facility was also under construction during this period.

Construction of a refinery in Reynolds, Indiana was suspended in October 2007.

40.    The Company was thus devoting tremendous resources to getting these refineries

online.  The 2Q08 10-Q shows that the Company spent over $188 million dollars on purchases of

property and equipment during the first six months of 2008 alone.  Additionally, during this

period, the Company took on over $97 million in debt to help finance this rapid expansion,

resulting in a staggering net decrease in cash and cash equivalents of over $179 million for the

first half of 2008 including cash of $53 million in cash from the US BioEnergy acquisition.

41.    As a result of the merger with US BioEnergy and the Company's rapid expansion

of ethanol refineries throughout the Midwest, VeraSun was spending tremendous amounts of

cash for construction and development of the refineries. As a result of this rapid development,

liquidity problems at VeraSun intensified.

### C.    VeraSun's Undisclosed Liquidity Crisis

42.    During the Class Period, the Defendants publicly stated that VeraSun had

sufficient cash to meet its financial obligations. However, internally it was quite clear that the

Company's liquidity was quickly declining and would not be sufficient for its needs and

obligations. Confidential Witness No. 1 ("CW1") was the Assistant Controller at VeraSun and

reported initially to Defendant Meier and later to Controller Virg Garbers. CW1 recalled that "in

the May-June 2008 timeframe, I remember that there were specific consultants from

AlixPartners that were on premises assisting with [VeraSun's] cash flow projections and

management." AlixPartners is a firm that "specializes in improving corporate financial and

operational performance…[and] executing corporate turnarounds…in urgent, high-impact

situations," according to its website. "This was at the same time that other liquidity issues

became apparent at VeraSun, such as slowing up our payables and using outside consultants to

be more aggressive with the collection of our receivables." CW1 elaborated that, "when

[VeraSun] went into bankruptcy at the end of October 2008, I noted **that the same people from

AlixPartners I saw in May-June 2008 [that were] assisting with our cash flow were also

now our bankruptcy consultants**." This "really upset" CW1 because "we had bankruptcy

consultants brought in as early as May-June 2008 and were not told who they were."

43.    CW1 also confirmed the clear knowledge of the Company as to urgent liquidity

problems early in the Class Period. "Just after the merger with U.S. BioEnergy [in April 2008], I

was asked by Bryan Meier, which was my direct report and the company's Controller, to stretch out vendor payments. Accounts payable reported through me." CW1 added that "in the May-June timeframe, Danny Herron, our CFO, contacted me regarding questions about the timely collection of accounts receivable. Our days outstanding for ethanol was 10-15 days, and ethanol and distillers grain 45-60 days. We hired a firm, 'Protiviti', to conduct an audit encompassing the entire accounts payable cycle from loading product onto cars at the plants."

44.     VeraSun's desperate liquidity problems early in the Class Period has been confirmed by others as well. Confidential Witness No. 7 ("CW7") was the Treasurer of US BioEnergy prior to the merger and worked at VeraSun through July 31, 2008. Along with VeraSun Controller Virg Garber, CW7 was tasked with developing cash flow projections for the US BioEnergy plants. CW7 indicated that liquidity was already an issue at VeraSun when it merged with US BioEnergy effective April 1, 2008. CW7 states that, in or around May 2008, VeraSun became eager to sell corn owned by a US BioEnergy plant to add needed cash. CW7 was "personally aware of [VeraSun's] aggressive position to unlock $40 million by way of a grain sale – that they ultimately would have to replace – from a [US BioEnergy] plant that was scheduled to open in the future. This was a situation where VeraSun inherited a cash-rich plant but could not easily access those monies. The corn was to be sold at cost and the gain to be noted at the parent [level], and not the subsidiary [level] or the plant itself." The question of where the sale would be booked was a point of contention according to CW7. VeraSun "wanted it booked at the parent company level and I believed and lobbied for it to be booked at the plant level, as was our [US BioEnergy] practice," said CW7.

45.     In fact, throughout Spring and Summer 2008, VeraSun sought to find ways to shift cash away from individual plants and onto the corporate balance sheet, which had not been

done in the past. Confidential Witness No. 5 ("CW5"), a Plant Accounting Manager at several VeraSun plants, including the Ord, Nebraska plant, claimed that VeraSun was significantly concerned about liquidity in early June 2008. CW5 recalls a meeting s/he attended in Brookings, South Dakota on June 3 and 4, 2008, at which time s/he "was aware of every day cash flow meetings" that included Controller Virg Garbers, Assistant Controller Misty Alfson, Treasurer Julie Lorenzen, staff accountant Amanda Oftedal, Linda Clark of Accounts Payable and Defendant Meier. CW5 noted that holding such daily meetings "was highly irregular and this kind of analysis and assessment should not have to be done daily unless something was wrong."

46.    VeraSun's liquidity problems were also discussed at a meeting of plant managers in mid-June 2008, which was attended by Confidential Witness No. 6 ("CW6"), VeraSun's General Manager at the plant in Ord, Nebraska. Senior Vice President of Operations Paul Caudill led the meeting, which was held at the Fairfield Inn & Suites in Brookings, South Dakota. CW6 recalls that "Caudill told us how negative the margins were and how negative things were overall and that we needed to make savings at the plant level." In addition, "Caudill told us that we were facing $7.00 per bushel of corn, with falling ethanol prices and we were losing money and as such we needed to manage the best we could at the plant level – that we needed to prepare for everything that would be coming." CW6 "realized that with this situation – if we did not have market protection – we would be in trouble."

47.    In May 2008, in order to hide the growing liquidity problems from investors, the Company secured a $125 million credit facility from UBS Investment Bank ("UBS"). On May 12, 2008, VeraSun issued a press release announcing its financial results for the first quarter of 2008 and filed the 1Q08 10-K. The 1Q08 10-Q announced that on May 5, 2008, VeraSun entered into a revolving credit facility with UBS, under which UBS would provide VeraSun with

a credit facility of up to $125 million. The Company announced it expected to enter into the new credit facility no later than May 31, 2008. VeraSun claimed it intended to use proceeds derived from the credit facility for "general corporate purposes."

48.     The next day, on May 13, 2008, Defendants held an earnings conference call to discuss the Company's 1Q08 results. On the call, Defendant Herron assured investors that the Company had "**liquidity flexibility to continue to run our business and grow our business.**" When asked about the recently-secured $125 million credit facility, Defendant Herron described it as a "liquidity insurance policy," noting that "we have a large investment in working capital and that investment will grow as we more than double our quarterly volumes…"

49.     Unbeknownst to investors, however, the $125 million credit facility was not an "insurance policy" for **potential** liquidity problems; rather, the Company required the money to stop the bleeding of cash caused by VeraSun's rapid expansion and high overhead due to unmanageable construction and development costs of the refineries. By June 30, 2008, the revolver had already been drawn down by the $40 million.

50.     As confirmed by Confidential Witness No. 8 ("CW8"), a high-ranking employee in the tax department at VeraSun, by June 2008, liquidity problems at VeraSun had reached a crisis proportions. Incredibly, at the same time the bankruptcy consultants were searching for any cash possible for the Company, the Defendants were publicly touting that the Company had the liquidity necessary to support its plan for "accelerated growth" and rapid expansion. In June 2008, CW8 "had specific conversations with several consultants and also with bankruptcy consultants that were working on cash flow models at the time." CW8 added that during that period, VeraSun's "Treasury group was working overtime" and that Jim Bonsall of APS Services (a bankruptcy/restructuring consultant) was working with the Company. CW8 stated that "the

Rothschild people were looking for money – they were marketing VeraSun assets to sell."

51.    CW3 also noted that cash was tight and liquidity was an issue: "We [VeraSun] were put on pre-pay for natural gas in June 2008. . . or even earlier."

52.    As VeraSun continued to funnel money for construction and development of its refineries, the liquidity issues worsened. According to CW1, "cash was being used primarily for the price of corn, construction costs and bills coming due and debt service. VeraSun had the Hartley, Welcome, Bloomingburg and Reynolds plants coming on stream with bills due and payable. [US BioEnergy] had Hankinson, Janesville and Dyersville coming on stream."

53.    In a desperate effort to conserve cash, the Company announced on June 25, 2008 that it had halted construction and opening of three of its ethanol refineries in the Midwest. In a Form 8-K filed with the SEC on June 25, 2008 ("June 25, 2008 8-K"), VeraSun stated that "the Company has previously indicated that it expected to begin production at its newly constructed facilities located in Welcome, Minnesota, Hartley, Iowa and Hankinson, North Dakota in the first six months of 2008. In light of current market conditions, the Company expects to delay the start-up of each of these facilities beyond the second quarter of 2008. The Company will continue to closely monitor market conditions and anticipates commencing production at each of these facilities as and when conditions improve."

54.    According to CW10, an Analyst at VeraSun who was responsible for assisting with construction of the VeraSun refineries until March 2008, the real reason that VeraSun abruptly halted construction of its refineries was because the Company was experiencing "cash flow issues." According to CW10, the construction and development of these refineries required significant cash and VeraSun "had to pump significant cash to get the plants up and running."

55.    In June and July 2008, VeraSun was searching for any possible sources of cash.

For example, as explained by CW1, "we used to pay all of our vendors always on time, specifically within zero to 30 days outstanding. We had over one-thousand vendors in our aging report. By the end of July 2008, at least 15% of our payables had been stretched out 30 to 90 days, or even longer, as was ordered by [Defendant] Meier."

56.     By late summer 2008, VeraSun was going to great lengths to create the illusion of strong liquidity. This included, among other things, changing internal accounting processes so cash would be available at the corporate level, rather than at the level of individual production plants. For example, "net-back" revenues were credited to the corporate level rather than the production plant from which the ethanol was sold. Net-back revenue is revenue generated from the sale of ethanol, net of all production costs.

57.     CW5, the former Plant Accounting Manager of several of the Ord plants, noted that: "Starting in August 2008, [VeraSun] was always draining and sweeping money from the Central City and Ord plants." According to CW5, "All of the [US BioEnergy] plants were separate LLCs so that each plant was responsible for cash flows with sales net backs, and hedging gains and losses and all excess funds coming back to the plants. These monies were kept and applied against outstanding loans with AgStar Bank as the beneficiary." However, by the end of August 2008, CW8 explains that "the Provista related sales net-backs that would come back to our plants went instead to [VeraSun] directly." CW8 clearly remembers the change in procedure because, "as of September 1, 2008, [the Ord, Nebraska plant] had $14 million in the bank, and by the end of September 2008 we were broke. In mid-September 2008, I was also aware of [VeraSun] sweeping money from our Ord account, specifically $2.8 million which was taken to an inter-company account."

**D.    The Defendants' Speculative Hedging Activities In July 2008 Exacerbate The Liquidity Crisis**

58.    VeraSun's gross margin largely depends on what is known as the "Crush Spread," *i.e.*, the difference between corn and ethanol prices.  Corn and ethanol prices do not necessarily correlate because they are impacted by different supply and demand conditions.  Corn prices are affected by factors such as weather, crop conditions and international trade, while ethanol prices are determined by the supply and demand for fuel, regulations and the availability of alternative fuel additives.

59.    In early 2006, the Crush Spread was more than $2.50 -- an historically high level. This was due to oil companies replacing a competitive product, MTBE, with ethanol.  However, the Crush Spread significantly narrowed in the fourth quarter of 2007 ("Q4 2007") and into 2008, during which time Crush Spreads averaged less than $0.50.  This narrowing of the Crush Spread adversely affected VeraSun's already strained financial condition.

60.    VeraSun uses a substantial amount of corn and, therefore, would attempt to mitigate its exposure to fluctuations in commodities prices by "purchasing forward" a portion of its corn requirements and by purchasing corn and natural gas futures contracts.  A futures contract is an agreement to buy or sell a specified amount of a commodity at a specified price at a future date.

61.    During the Class Period, VeraSun used short financial positions to hedge its physical purchases of corn.  The Company stated in its filings with the SEC that it "seek[s] to mitigate [its] exposure to commodity price fluctuations by purchasing forward a portion of [its] corn requirements on a fixed price basis and by purchasing corn and natural gas futures contracts..."  Specifically, in VeraSun's 2007 10-K, the Company described its pricing and hedging strategy:

We seek to mitigate our exposure to commodity price fluctuations by purchasing forward a portion of our corn requirements on a fixed price basis and by purchasing corn and natural gas futures contracts. To mitigate ethanol price risk, we may sell a portion of our production forward under fixed price and indexed contracts. The indexed contracts are typically referenced to a futures contract such as unleaded gasoline on the New York Mercantile Exchange, or NYMEX, and we may hedge a portion of the price risk associated with index contracts by selling exchange-traded unleaded gasoline contracts. We believe our strategy of managing exposure to commodity price fluctuations will reduce somewhat the volatility of our results.

As part of the ASA acquisition, we acquired the Linden, Albion and Bloomingburg facilities subject to long-term agreements with Cargill, Incorporated ("Cargill") under which Cargill is responsible for supplying all corn and natural gas to the facilities and providing commodities risk management services. Generally, these agreements have ten year terms, except the corn supply agreement which has a twenty year term, and provide for the purchase and sale of commodities and products between the parties at market prices, and the payment of specified fees to Cargill.

Corn procurement and hedging strategy. We employ the following corn procurement methods and related hedging strategies:

· we purchase corn through spot cash, fixed-price forward and delayed-pricing contracts; and

· we use hedging positions in the corn futures market to manage the risk of excessive corn price fluctuations for a portion of our corn requirements.

For our spot purchases, we post daily corn bids so that corn producers can sell to us on a spot basis. Our fixed-price forward contracts specify the amount of corn, the price and the time period over which the corn is to be delivered. These forward contracts are at fixed prices based on Chicago Board of Trade, or CBOT, prices. Our corn requirements can be contracted for up to a year in advance on fixed-price forward contracts. The parameters of these contracts are based on the local supply and demand situation and the seasonality of the price. For delayed pricing contracts, producers will deliver corn to the plant, but the pricing for that corn and the related payment will occur at a later date.

We may buy futures positions on the CBOT to hedge a portion of

our exposure to corn price risk. In addition, our facilities have
significant corn storage capacity. To help protect against potential
supply disruptions, we generally maintain inventories of corn at
each of our facilities. This corn inventory ranges generally from
10 to 30 days of supply, depending on the time of year, the current
market price for corn and other factors.

62.     With the Company still pumping money for construction and development of the
six ethanol refineries and one oil extraction plant across the Midwest, the Company's liquidity
position worsened in the summer of 2008. In June and July 2008, corn prices increased from
$5.00-$6.00 per bushel all the way up to near $8.00.

63.     Because purchasing futures requires maintaining a margin balance, VeraSun
decided to change its risk management strategy and exit the short financial positions in early July
to preserve cash. CW5 stated: "Our margin calls for the short corn futures contracts were about
$1 million per day for 10 plants. There were always margin calls and this started in March or
April 2008." CW4 further added: "On an October 208, 2008 grain originators call wherein Vice
President, Risk Management, Joel West and Jack Nelson, Director of Commodities informed the
group that there was a significant loss to close out the short corn futures contracts." The
Company changed its hedging strategy to one that required **less cash** up front, even if this meant
substantially increasing its financial exposure. CW1 finally added that "the greatest disconnect
or change from our [VeraSun] normal procedures and what we were disclosing in our SEC
filings was that we were no longer able to hedge our corn procurement needs when cash became
very tight and we closed out our short corn futures position in July 2008. The reason we closed
out the short positions was that we could no longer afford the margin calls. We were no longer
able to hedge as was our normal practice when we entered into our corn accumulator positions."

64.     Pursuant to the accumulator contracts the Company entered into, VeraSun
purchased corn at an average price between $6.50 and $7.00 per bushel.

65.    Accumulator contracts typically involve committing to buy a fixed quantity of a commodity at an agreed upon price over a certain period of time.  The price is typically fixed at a deep discount to the market price at the time the agreement is initiated.  VeraSun's accumulator contracts committed the company for 12 months – an extremely long period of time – which made the transaction highly speculative.  Confidential Witness No. 11 ("CW11"), a former US BioEnergy Director of Risk Management, described accumulator contracts as follows: "These contract were good [for VeraSun] since you did not have to put out any cash.  They were no different than Madoff stuff."

66.    In a typical accumulator contract, a party's obligation to buy ceases if the market price for the commodity increases beyond a predefined "knock-out price."  However, as long as the market price remained below the knock-out price, the investor is obligated to continue making purchases.  In addition, accumulator contacts (including the ones VeraSun entered into) can include a "step-up" feature, which increases the purchase obligation if market prices decline.  That is what happened to VeraSun, when suddenly it was obligated to purchase twice as much corn as originally committed to – an amount far beyond what was needed for its business operations, and at prices considerably higher than the current spot price.

67.    In late July and early August 2008, corn prices commenced a sharp decline from almost $8.00 per bushel to nearly $5.00 per bushel.  As a result, VeraSun had to pay above market prices for corn under the oppressive accumulator contracts.  With VeraSun producing 1.4 billion gallons of ethanol a year, the additional expense resulting from the accumulator contracts quickly overwhelmed any cash flow from the sale of ethanol.  The high overhead involved with the construction of seven plants combined with losses from the accumulator contracts put the Company at the brink of bankruptcy.

68.     The Company's underlying cash crisis led it to enter into the accumulator contracts that ultimately resulted in enormous derivative-related losses. CW4 explained the connection between the liquidity problems and the need to enter into the accumulator contracts:

> To solve the cash problem and keep corn coming into the system, corn was contracted through "accumulator contracts" which did not require hedge related margin. The corn accumulator contracts were entered into shortly after the short corn futures contract was closed-out in early July 2008. Management thought that the price of corn was going to go up. To properly hedge the accumulator contracts you would need to enter into a short futures contract – for instance, the same futures instrument that was closed out in early July 2008 which needed margin and cash or the selling of a put against the accumulator position – but the company had run out of cash and could not enter a hedge or perform its risk management function fully – they did not have the cash to offset the accumulator position.

69.     The result of failing to properly hedge with regard to the accumulator contracts was disastrous for VeraSun, according to CW4:

> Unfortunately, the corn market went against the accumulator contracts as the prices fell. The company was obligated to buy corn at prices below the spot market for corn. The company simply did not have the cash to protect and hedge the accumulator contracts as it should have. Entering into the corn accumulator contracts was the opposite of closing out the short futures contract. So by not being able to "hedge" the accumulator contracts the company was compounding its risk and in effect "doubling up" on risk since there was no off-setting counter or short position to the accumulators.

70.     Confidential Witness No. 12 ("CW12"), a former VeraSun Director, Internal Audit and Compliance, similarly explained:

> I can't understand why VSE was putting on accumulator contracts – this was pure speculation. With the accumulators VSE was going long on corn. They were long purchase contracts, long inventory and long futures – this is what accumulators are comprised of. The accumulators was very high risk and not easily off-set by a hedge. A hedge is where you zero out risk by protecting corn inventory and purchase contracts at the plants. The

only off-set position to the accumulators is to have more corn sales
contracts than purchase contracts plus corn inventory." VSE was
now "naked," not hedged and speculating – that is why the losses
were as high as they were as to the corn derivatives contracts.

71.    According to CW4, who purchased grain at VeraSun's Ord, Nebraska plant

beginning in 2007, "[t]he corn accumulator contracts were entered into shortly after the short

corn futures contract was closed-out in early July 2008" when "the company did not have cash to

continue" the short corn futures contracts. In order "[t]o solve the cash problem and keep corn

coming into the system, corn was contracted through accumulator contracts which did not

require hedge related margin." Indeed, **the company was using all of its cash to only run the**

**plants in early July 2008 and there was no available cash now to enter into hedge**

**positions**." "The company was obligated to buy corn at prices below the spot market for corn"

when "the corn market went against the accumulator contracts as the prices fell." As a result,

according to "[Vice President of Risk Management] Joel West and [Director of Commodities]

Jack Nelson ... the company had lost $100 million from its corn hedging strategies."

72.    CW9, a grain purchasing manager for the Central City production plant, also

confirmed that the liquidity problems the Company was experiencing caused it to modify its risk

management practices: "to properly hedge ... you have to have enough cash to fund the

offsetting futures position until the position can be liquidated. So the red flag was up when they

were forced to close the short position because the company could no longer fund the margin

calls. If they would have left the short position on, it would have worked itself out and the hedge

would have met its objective." At this point, according to CW9, the Company entered into ultra-

risky accumulator contracts and since it "could not afford to maintain the off-setting positions ...

there were no [other] hedging techniques available to them."

73.    By August 2008, the Company was in a desperate situation with regard to

liquidity. On August 14, 2008, the Company announced that it had commenced a secondary public offering for $750,000,000. In the August 14, 2008 Form S-3, the Company claimed that it "intend[ed] to use the net proceeds of any offering of our securities for working capital and other general corporate purposes, which may include the repayment or refinancing of outstanding indebtedness." The real purpose of this offering was to quickly raise capital in an effort to prevent a disastrous impact from the huge losses experienced by the Company as a result of its speculative trading, risky bets on the price of corn, and uncontrolled construction spending.

74.    According to CW1, in August 2008, Defendant Meier explained to him/her that the offering was "**necessary in order to raise cash and meet [the Company's] pressing liquidity needs** – we needed to cover payables past due. [The Company] now were at 35-45% of [VeraSun's] payables that were out 30-90 days with some payables even longer."

**E.    The Defendants' Knowledge Of The Liquidity Problems At VeraSun**

75.    During the Class Period, Defendants Endres, Herron and Meier were fully knowledgeable of VeraSun's liquidity problems. Defendants Endres, Herron and Meier all were directly involved in the risk management process and, at the time they made representations to the public, had information that conflicted with those representations.

76.    As CW1 confirmed, Defendants had hired bankruptcy consultants from AlixPartners that were assisting the Company with cash flow projections. Defendant Meier also asked CW1 to slow the Company's accounts payable just after the merger with US BioEnergy in April 2008.

77.    CW1 explained that daily entries regarding reconciliations and margin calls were made on an Excel spreadsheet by two VeraSun staff accountants in the accounting department: Amanda Oftedal and Joe Hegge. These daily Excel spreadsheets were given to Defendant Meier,