Virg Garbers, Jack Nelson, Joel West, Doug Coyne and plant-level grain managers. The accounting department would reconcile and verify the trade slips that were provided by the plant-level grain traders and FC Stone, a commodity risk management and trading company.

78.     The Excel spreadsheets were also discussed during a weekly risk management conference call each Tuesday morning, according to CW1. The risk management committee included Defendants Herron and Endres, Brian Meier, Barry Schaps, Virg Garbers and Jack Nelson. CW1 explained that Doug Coyne and "the grain managers" also participated in weekly calls. CW1 participated in approximately six meetings of the risk management committee between March and September 2008 and Defendant Endres was at every one of those meetings.

79.     This information is confirmed by Confidential Witness No. 2 ("CW2"), who is a former VeraSun Controller and the predecessor of Defendant Meier. CW2 indicated that Defendant Endres was quite involved in all risk management decisions, including the weekly risk management meetings. CW2 attended the weekly meetings, along with Defendants Endres and Herron, Commodities Manager Jack Nelson and various plant grain purchasers. Frequent conversations regarding risk management were also had with Board members. CW2 stated that "Endres and the rest of us did a lot of research – there was substantial involvement in risk management – there was significant analytic work done."

80.     Confidential Witness No. 3 ("CW3") provided additional confirmation and details regarding the weekly risk management meetings. CW3 was a commodities trader for US BioEnergy who was later employed by VeraSun in a similar capacity on a transitional basis. CW3 stated that: "VeraSun had a standing weekly risk management call which lasted between 30 minutes to one hour and included: Barry Schaps, Joel West, Doug Coyne, Danny Herron, and Don Endres. The calls typically described and identified the company's current trading and

hedge positions, the margins involved in the trading and hedge positions, and what trades or hedges were being put on at the time or were to be put on." CW3 knew of the risk management conference calls because he occupied the office next to that of Joel West, Vice President of Risk Management, a regular participant in the calls. In addition, West would occasionally talk with CW3 about what was discussed during the calls. CW3 also indicated the he "was aware that Don Endres…received reports on the company's trading and risk positions."

Defendants Endres, Herron and Meier were also aware of the Company's liquidity crisis from the beginning of the Class Period, yet continued to assure investors that the Company had sufficient cash. As CW1 explained, bankruptcy consultants from AlixPartners were on VeraSun's premises as early as May or June 2008. Even at such an early point in the Class Period, AlixPartners and others were advising VeraSun regarding cash flow projections, collection of receivables and other liquidity issues. For the foregoing reasons, Defendants Endres, Herron and Meier cannot claim ignorance of the scope and significance of the Company's liquidity issues and hedging activities. This information was known to them at the time they made (or caused VeraSun to make) the materially false or misleading statements to investors regarding the Company's financial condition alleged herein.

     81.     On September 16, 2008, only **one month** after Defendants assured investors that VeraSun's liquidity was strong, the Company finally admitted that it was suffering a cash shortage and expected to take an estimated loss of at least $63 to $103 million. In a Form 8-K filed with the SEC on September 16, 2008 ("September 16, 2008 8-K"), Defendants finally admitted that the Company was short on cash and that the accumulator contracts were essentially a risky bet on the direction of corn prices, and that VeraSun had ended up on the wrong side of the bet:

We historically have employed short financial positions to hedge our physical purchases of corn. In July 2008, after corn prices had risen from approximately $6.00 per bushel at the end of May 2008 to almost $8.00 per bushel due to extraordinary weather conditions in the Midwest and broader commodity market trends, **we chose to exit our short financial positions in corn** to mitigate what we considered to be unacceptable margin exposure in our futures positions. Upon termination of these short financial positions, we effectively priced our corresponding physical purchases of corn at the then-current market price, which proved to be significantly higher than today's market prices for corn. In addition, based on market forecasts that corn prices would continue to rise, **we entered into a number of "accumulator" contracts** relative to corn requirements for the third and fourth quarters that, in each case, allowed us to purchase a specified volume of corn at prices below then-prevailing market rates, but also **required us to purchase that same volume of corn (in addition to the initial purchase) at one or more lower prices per bushel should market prices decline to or below those lower levels over the duration of the contract.** Shortly thereafter, corn prices commenced a sharp decline from almost $8.00 per bushel to a low of under $5.00 per bushel in mid-August 2008. **As a result, we were required under the accumulator contracts to purchase additional amounts of corn at prices that proved to be higher than prevailing market prices.** As a result of these various hedge positions, as well as the difficult operating environment, we expect to record average corn prices of between $6.75 and $7.00 per bushel during the third quarter of 2008.

82.    On October 31, 2008, a **mere six weeks** after the Company warned of a large loss from its bad bets on corn prices, VeraSun filed for Chapter 11 bankruptcy protection.

## FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

83.    On March 12, 2008, on the heels of VeraSun's announcement of the US BioEnergy merger, the Company held an earnings conference call to discuss its financial results for the period ending December 31, 2007. On the call, Defendant Herron claimed that "[t]he company continues to maintain a strong balance sheet with $154.4 million of cash and short-term investments at the end of 2007." During the call, several analysts asked about the Company's liquidity and the cash flow needed for the construction of the ethanol refineries. Defendants

reported no liquidity issues that would hinder the Company from growing in the ethanol

industry. In fact, Defendant Herron assured investors that the Company's **liquidity was strong**:

> Analyst: …how much money do you have left to spend on the
> construction of plants and how do you anticipate funding that?
>
> Defendant Herron: …Basically, in the first quarter we expect[ed]
> somewhere between $75 and $100 million to be spent in the
> second quarter. We will be between $50 and $75. Now, you
> know, the rest of the projects are always controllable, but we will
> get our three plants that are under construction up and running for
> sure. Based on our current expectation of cash flows from
> operations and the cash and cash equivalent short-term
> investments, and also our revolving credit facility, **we feel we will
> be in a position to fund those capital investments for the year.**

84.    On the same call, Defendant Endres also assured analysts that the Company had

sufficient working capital:

> Analyst: I just want to drill down on the liquidity question a little
> further. **I think you said your Cap Ex for the full year is
> expected to be 175 to 257 million. Could you give us guidance
> [on] how much in change in working capital is expected to
> absorb through the year. And also is there any talk to expand
> [the] 30 million credit facility you guys have just to have that
> extra –**
>
> Defendant Endres:…We think working capital will stay about
> where it is for the balance of the year. As for the cost of expanding
> the revolving facility, actually wouldn't anticipate any cost on that.
> **We were in discussion to expand our revolver from the 30
> million up to a total of around $210 million. Now, that facility
> will have an accordion feature in it so we want to expand it
> instantly to 210** because quite honestly it only serves the organic
> VeraSun plants. So it would be backed by receivables coming out
> of the five organic plants. The ASA facilities are under a term loan
> in construction agreement and they would not participate in that
> revolver. And with the anticipated closing of [the] U.S. Bio
> [acquisition] they have financing in place for their plants. It's
> more of a project debt financing.
>
> Analyst: Are there any covenants on those project debt that we
> should be aware of?

Defendant Endres: You know, there are various filed in our – on the [U.S. BioEnergy] side on the ASA plants that we bought, basically those are normal construction financing and project debt. And they have the basically, just have repayment schedules that keep the cash trapped at those facilities. But they are self-funding and they are all profitable at this point so **[I] don't anticipate any issues there**.

85. Another analyst on the March 12, 2008 analyst call specifically asked about the Company's cash flows:

> Analyst:…when I look at your balance sheet compared to other manufacturers, you're obviously carrying more debt. And I'm wondering if there's any plan to begin paying that off at an accelerated rate or where you guys are standing with that?

> Defendant Endres:…obviously we're focused on getting our plants that are under construction completed. And a lot of that answer will depend on the margins. The one thing I would say is beginning in the third quarter we will have 400 million gallons per quarter of capacity. So, if margins expand as they normally – in the summer driving season you would normally expect pricing to get better. We believe that there is plenty of corn available on a true supply and demand. Corn markets have been driven more by optimistic financial markets than they have been by supply and demand, we believe. So, we think margins could expand. And if they do, we will generate tremendous amounts of cash with 400 million gallons per quarter of shipments. So, we'll wait and see where that is. **Obviously we're going to run a prudent balance sheet and continue to fuel our growth and meet all our debt obligations**…

86. The statements above concerning strong liquidity and VeraSun's ability to fund capital investments throughout the upcoming year were materially false and misleading because Defendants failed to disclose that the Company was experiencing significant liquidity problems in growing the Company at an extraordinary rate through expansion of its ethanol refinery facilities throughout the Midwest.

87. On May 12, 2008, VeraSun issued a press release announcing its financial results for the first quarter of 2008 and filed the 1Q08 10-Q. The 1Q08 Form 10-Q announced that

VeraSun entered into a $125 million revolving credit facility with UBS on May 5, 2008. The Company announced it expected to enter into the new credit facility no later than May 31, 2008. VeraSun stated that the credit facility would be used to fund general corporate purposes. Notably, the amount of the credit facility was substantially smaller than the $210 million anticipated just a few weeks earlier in the March 12, 2008 conference call. However, the Defendants did not state that the lower amount would change any of the representations made in the March 12, 2008 conference call.

88. The next day, May 13, 2008, VeraSun held an earnings conference call to discuss its financial results for the first quarter of 2008. During the call, several analysts questioned the Company's liquidity and its recently-secured $125 million credit facility. In response, Defendant Herron assured investors that the Company had "**liquidity flexibility to continue to run our business and grow our business.**" Herron further stated:

> [T]he credit agreement will probably have some carveout with that ability but the focus is it is liquidity insurance, is how we think of it. **We have a large investment in working capital and that investment will grow as we more than double our quarterly volumes through our VeraSun marketing team. So it is really a liquidity insurance policy if you will.**
>
> And there will be times that we will draw on it because you will have in balance of inventories and receivables crossing from time to time. Quite honestly, we are going from shipping 195 million gallons in the first quarter to shipping 300 to 325 million in the second and the third quarter we will probably be approaching 400 million gallons. So there is a large increase in working capital requirements.

89. Defendant Herron's statement on the May 13, 2008 earnings conference call was materially false and misleading because he failed to disclose that the Company's continued expansion of ethanol refinery facilities had completely undermined the VeraSun's liquidity position and was financially crippling the Company.

90.    On June 2, 2008, VeraSun issued a press release titled "VeraSun Energy Closes $125 Million Revolving Credit Facility." In the press release, Defendant Herron again assured investors that "this credit facility will provide **additional liquidity sources to support our accelerated growth**."

91.    The June 2, 2008 press release was materially false and misleading because it failed to inform investors that, notwithstanding the new credit facility, the Company's liquidity was so impaired from the rapid expansion of ethanol refineries, the $125 million revolving credit facility was needed just to keep the Company afloat rather than to serve as insurance for a potential liquidity crisis.

92.    On August 11, 2008, VeraSun filed the 2Q08 10-Q. It described the Company's liquidity position as being strong and noted that "based on current market conditions, **we believe that our existing sources of capital will be sufficient to fund anticipated working capital requirements, capital expenditures and cash required for other activities for at least the next 12 months**." (Emphasis added).

93.    The Company's 2Q08 10-Q also touted the benefits of the completed acquisition of US BioEnergy, noting that:

> The merger is an opportunity for two leading companies in the renewable fuels industry to capitalize on synergies and provide value for shareholders. It also underscores the commitment of each company to execute on its growth strategy to become a large-scale, low-cost ethanol producer. **The merger is expected to create a unique and stronger business platform by improving access to capital** and allowing the combined company to leverage technology and operating experience across its entire plant fleet.

94.    The 2Q08 10-Q was materially false and misleading at the time it was filed because Defendants inexplicably failed to disclose VeraSun's material losses related to its corn hedging strategy and accumulator contracts. In contrast to Defendants' rosy statements in the 2Q08 10-

Q, the losses under the accumulator contracts, coupled with the cash flow problems already existing as a result of VeraSun's aggressive expansion, further deepened the Company's liquidity crisis.

95.    On August 12, 2008 the Company held a conference call to announce VeraSun's second quarter 2008 earnings. When an analyst asked if the Company had enough liquidity to continue to open the refineries and finance the Company's existing operations, Defendant Herron responded "Yes. . . That would be our current view given market conditions…**[B]ased on our current view and what we know, yes, we think we'll be just fine.**" Unbeknownst to investors, however, VeraSun's business at that time was anything but strong. To the contrary, the Company was facing a catastrophic liquidity crisis resulting from VeraSun's aggressive expansion and speculative and risky derivative transactions in corn.

96.    On the August 12, 2008 call, Defendant Herron claimed it was a "strong quarter for VeraSun" and touted the Company's "accelerated growth" and the "$80 million to $160 million of potential profitability improvement over the next 18 months," which was "primarily . . . a result of the merger with [US BioEnergy] that occurred on April 1." Herron further claimed:

> VeraSun made some tough decisions during the quarter, as we chose not to start up three new facilities as a result of extremely unfavorable market conditions… in mid-June, the spread between [ethanol prices and corn prices] got as a narrow as $.08 per gallon. In essence at the time the overall industry margins were about a negative $0.50 per gallon. Now, that low point occurred just a few days before we were scheduled to grind corn at the Welcome plant. Based on the industry condition at the time and the extreme volatility, I think we saw a $2 – over a $2 rise in corn prices in about 60 days. . . Based on that volatility and the market conditions, we chose to delay the Welcome, Hartley and Hankinson startups. Now since then based on improved market conditions, we have chosen to start up our Hankinson plant and we are currently commissioning our Hartley plant for startup. We'll continue to monitor market conditions and volatility to determine the right time to start up Dyersville and Welcome. But at this time, we think that the overall conditions will be such that it will allow us to start up Dyersville and Welcome by the end of Q3.

97.    On the August 12, 2008 call, Defendants assured investors that the high price of corn would have a minimal impact on the Company. Defendant Herron claimed "[o]ur corn procurement team did a good job this quarter as their actual corn cost was $5.37 per bushel. That's $0.93 per bushel less than the average [sic] bought corn price of $6.30 for the quarter" (second alteration in original). Defendant Endres also downplayed the increased corn costs, noting that "[m]any in the media continue to focus on corn costs as a primary driver of lower industry margins. The point I want to illustrate is that tightening spreads are more about ethanol value than increased corn costs." Similarly, Defendant Meier claimed that the "corn cost [was] between $5.90 and $6.15 per bushel." Meier also downplayed the high costs of corn, noting that while "th[e corn costs] seem[] high[,] during the second quarter, we recorded a mark-to-market gain of $25.6 million which will reverse in the third quarter."

98.    Defendants' statements on the August 12, 2008 conference call were materially false and misleading because they failed to disclose that VeraSun had entered into accumulator contracts that locked the Company into future corn purchases at prices above the then-current market price. Unbeknownst to investors, the Company had placed a huge gamble on the price of corn and the rapid decrease in corn prices had already locked in massive losses. Importantly, the significant drop in the price of corn was not due to simple market fluctuations. Prices dropped when it was revealed at the beginning of August that the 2008 United States corn harvest would be the second largest in history. This allayed the fears of limited corn supply due to early season weather problems that drove up the price of corn. Thus it was clear that corn prices would not rebound. Further, VeraSun was forced to incur a loss of $30 million in addition to the accumulator-related losses when it closed its short corn futures contract in early July 2008. Combined with the cash flow problems that resulted from the integration with US BioEnergy and

VeraSun's rapid expansion, the Company was facing a liquidity crisis in a business that requires a tremendous amount of cash to purchase commodities.

99.    The accumulator contracts were entered into in July 2008. Thus, at the time of the August 12, 2008 conference call, the Defendants knew that the Company was locked into these costly contracts. Indeed, four weeks later, on September 16, 2008, the Company admitted to liquidity problems and filed for bankruptcy shortly thereafter.

100.    On August 14, 2008, the Company filed the August 14, 2008 Form S-3 announcing that it had commenced a public offering for $750,000,000 over the next three years. In the August 14, 2008 S-3, the Company claimed that it "intend[s] to use the net proceeds of any offering of our securities for working capital and other general corporate purposes, which may include the repayment or refinancing of outstanding indebtedness."

101.    In reality, this was a last ditch effort to raise cash to cover the huge losses experienced by the Company as a result of its speculative trading and risky bets on corn prices. Consistent with the Defendants' public statements, the August 14, 2008 Form S-3 failed to disclose the Company's liquidity crisis and the large losses it was facing stemming from its botched attempts to hedge the price of corn.

102.    The falsity of Defendants' statements during the August 12, 2008 conference call is corroborated by the fact that on September 16, 2008, a mere four weeks later, the Company admitted to insolvency problems and a bankruptcy filing followed shortly thereafter.

103.    On September 16, 2008, unable to raise enough money to hide the massive losses from bad bets on corn and only **one month** after Defendants announced positive earnings and assured investors its liquidity was "strong," the Company finally admitted that it was suffering a cash shortage and was expecting to take an estimated loss of at least $63 million to $103 million

for the third quarter of 2008. The Company blamed the losses on, among other things, the change in hedging strategies resulting from the Company's liquidity issues.

104. This disclosure, made after the market's close on September 16, 2008, caused a precipitous decline in the price of VeraSun stock. The next day, VeraSun's shares plunged 70% to as low as $1.41. Overall, the Company's shares lost over 80% of their value from the high during the Class Period of $8.60. These price declines, which resulted from the fraud alleged herein, caused Plaintiffs to suffer substantial damages in connection with their purchases and acquisitions of VeraSun shares during the Class Period.

105. The reaction among the investment community was swift. Credit rating agency Moody's immediately cut its rating of VeraSun debt from B2 to B3. Moody's warned of potential further downgrades if VeraSun could not raise funding through the equity markets. An analyst from Oppenheimer stated that VeraSun's actions "suggest ongoing liquidity difficulties." Similarly, Citi Investment Research's David Driscoll added that "our risk rating remains 'Speculative' as hedging losses are significant and the firm's liquidity issues remain unresolved."

106. On October 31, 2008, just six weeks after VeraSun first disclosed its huge losses, the Company filed for Chapter 11 bankruptcy protection. On that same date, VeraSun's counsel told the Bankruptcy Court that VeraSun had "**zero dollars in the bank.**" An October 31, 2008 declaration submitted by Defendant Herron explained the desperate situation to the Bankruptcy Court:

> Facing declining liquidity, the Company attempted to raise cash via a number of different transactions. A public equity offering failed. Efforts to raise debt or equity financing from private parties in sufficient amounts to sustain the Debtors' businesses also failed. During October 2008, the Company's cash deteriorated rapidly primarily as a result of a significant constriction of trade credit. Essentially out of cash to sustain operations, these Chapter 11 cases were commenced to access the only available source of funds

to keep operations alive.

107.    At a November 8, 2008 Bankruptcy Court hearing, VeraSun's counsel further confirmed that the "negative stories out there about our liquidity situation…were true[.]"

108.    On November 14, 2008, VeraSun filed a Form 8-K with the SEC announcing that Defendant Herron was terminated as the Company's President and Chief Financial Officer. Defendant Meier, the Company's Vice President, Finance and Chief Accounting Officer, assumed additional responsibilities as the Company's principal financial officer. Barry Schaps, Senior Vice President, Sales and Logistics, was also terminated around this time. VeraSun's risk management function, which devised and executed the Company's failed corn hedging strategies, reported to Herron and Schaps during the Class Period.

109.    On November 19, 2008, VeraSun filed a Form 10-Q with the SEC for the third quarter 2008 for the period ended September 30, 2008 (the "3Q08 Form 10-Q"). In it, the Company announced a staggering **$476 million loss** for the three month period – more than **four times** the loss the Company had predicted just a few weeks earlier. This loss included $119 million attributed specifically to corn-related derivative losses.

110.    In the 3Q08 Form 10-Q, the Company admitted it had "suffered a significant loss from operations as a result of various factors including dramatic changes in corn costs and falling ethanol prices." The Company warned that its future was "uncertain" and would depend on a number of factors, including its ability to secure adequate financing during bankruptcy proceedings and its ability to maintain adequate cash on hand.

111.    Then, on December 2, 2008, VeraSun's Counsel explained, "[I]n the face of declining liquidity, the **debtors attempted to raise cash through a number of different transactions, including a public offering and private financings**. These are efforts undertaken

on a pre–petition basis."

112.    As VeraSun's bankruptcy counsel explained to Judge Shannon during the November 3, 2008 hearing, additional facilities and capacity translated to debt: "I didn't give you the numbers of all of these facilities, but there's a lot of debt."

## LOSS CAUSATION

113.    The market for VeraSun common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements alleged herein and failures to disclose, VeraSun common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired VeraSun common stock relying upon the integrity of the market price of the Company's common stock and market information relating to VeraSun, and have been damaged thereby.

114.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of VeraSun common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

115.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about VeraSun's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive

assessment of VeraSun and its business, prospects and operations, thus causing the price of VeraSun common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulting in Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

116.    During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of VeraSun common stock and operated as a fraud or deceit on Class Period purchasers of VeraSun common stock. Defendants' false and misleading statements had the intended effect and caused VeraSun common stock to trade at artificially inflated levels throughout the Class Period. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of VeraSun common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of VeraSun common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

117.    The declines in the price of VeraSun common stock after the disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines in VeraSun common stock negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of VeraSun common stock and the subsequent significant decline in the value of VeraSun common stock when Defendants' prior misrepresentations and other

fraudulent conduct were revealed.

**NO SAFE HARBOR**

118.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of VeraSun who knew that those statements were false when made.

**PRESUMPTION OF RELIANCE**

119.    At all relevant times, the market for VeraSun common stock was an efficient market for the following reasons, among others:

(a)    VeraSun common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, VeraSun filed periodic public reports with the SEC and the NYSE;

(c)    VeraSun regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

>    (d)    VeraSun was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

120.    As a result of the foregoing, the market for VeraSun common stock promptly digested current information regarding VeraSun from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of VeraSun common stock during the Class Period suffered similar injury through their purchase of VeraSun common stock at artificially inflated prices and a presumption of reliance applies.

### COUNT I
### Violations of Section 10(b) of the Exchange Act And SEC Rule 10b-5
### Against All Defendants

121.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

122.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud or deceit the purchasers of the Company's common stock during the Class Period.

124.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for VeraSun common stock. Plaintiffs and the Class would not have purchased VeraSun common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

125.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of VeraSun common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

126.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

127.    During the Class Period, Defendants Endres, Herron, and Meier each acted as controlling persons of VeraSun within the meaning of Section 20(a) of the Exchange Act. Defendants Endres, Herron, and Meier devised and effectuated the fraudulent scheme and course of conduct alleged herein. By reason of their positions as officers and/or directors of VeraSun, and their ownership of VeraSun stock, Defendants had the power and authority to cause VeraSun to engage in the wrongful conduct complained of herein. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining this action is a proper class action, certifying Plaintiffs as Class

Representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class

members against all Defendants, joint and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: March 15, 2010                  Respectfully submitted,

                                       COHEN MILSTEIN SELLERS & TOLL, PLLC

                                       By: _____
                                       Christopher Lometti (CL-9124)
                                           (clometti@cohenmilstein.com)
                                       Daniel B. Rehns (DR-5506)
                                           (drehns@cohenmilstein.com)
                                       150 East 52nd Street, 30th Floor
                                       New York, NY 10022
                                       Telephone: (212) 838-7797
                                       Facsimile: (212) 838-7745

                                       Liaison Counsel for the Class

                                       GOLD BENNETT CERA & SIDENER LLP
                                       Solomon B. Cera (scera@gbcslaw.com)
                                       Gwendolyn R. Giblin (ggiblin@gbcslaw.com)
                                       Thomas C. Bright (tbright@gbcslaw.com)
                                       595 Market Street, Suite 2300
                                       San Francisco, California 94105
                                       Telephone: (415) 777-2230
                                       Facsimile: (415) 777-5189

BARROWAY TOPAZ KESSLER MELTZER &
    CHECK, LLP
Michael K. Yarnoff (myarnoff@btkmc.com)
Neena Verma (neena.verma@btkmc.com)
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

and

Nichole Browing (nbrowning@btkmc.com)
Erik Peterson (epeterson@btkmc.com)
580 California Street, Suite 1750
San Francisco, California 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

Attorneys for Plaintiffs and the Class

## CERTIFICATE OF PLAINTIFF

I, Wayne Mitchell, hereby certify that:

1. I am familiar with the matters set forth herein and am duly authorized to make this Certification on behalf of myself.

2. I have reviewed a complaint prepared by my attorneys, Gold Bennett Cera & Sidener LLP, and agree to be a representative plaintiff in this action.

3. I did not purchase VeraSun Energy Corp. ("VeraSun") securities that are the subject of the complaint at the direction of counsel or to participate in any private action arising under the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. I invested in VeraSun securities solely for my investment purposes.

4. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. I have reviewed the records of my transactions in VeraSun. I acquired and/or sold VerSun securities in the amounts and on the dates identified in the attachment hereto.

### [SEE ATTACHED SCHEDULE]

6. In the three years preceding the date of this certificate, I have not sought to serve as a representative party on behalf of a class in an action brought under the federal securities laws.

7. I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

8.    Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

I certify under penalty of perjury that the foregoing is true and correct. Executed on January 7th, 2010.

Wayne Mitchell

41219l0

·2·

**Wayne Mitchell**

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost Basis |
|---|---|---|---|
| VeraSun Energy Corp. | 04/01/2008 | 32,043 @ $7.25 | $232,311.75 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds from Sale |
|---|---|---|---|
| VeraSun Energy Corp. | 07/14/2009 | 32,043 @ $0.0124 | $398.79 |

**Loss:** ($231,912.96)

#121953

## CERTIFICATION

I, Son Nguyen ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has fully reviewed the facts and allegations of the complaint filed in this action.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiffs' counsel or in order to participate in any private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.     Plaintiff's purchase and sale transaction(s) in the VeraSun Energy Corp. (VSUN; VSUNQ) securities that are the subject of this action during the Class Period are attached in Schedule A.

5.     Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.     During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below:_____.

7.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __11__ day of January, 2010.


Signature                                      Print     SON NGUYEN

Son Nguyen

## SCHEDULE A

| Transaction | Type | Date | Quantity | Price |
|---|---|---|---|---|
| Purchase | Com Stk | 5/20/2008 | 500 | 7.3900 |
| Purchase | Com Stk | 5/20/2008 | 2,000 | 7.4000 |
| Purchase | Com Stk | 5/20/2008 | 800 | 7.5200 |
| Purchase | Com Stk | 5/20/2008 | 1,900 | 7.5300 |
| Purchase | Com Stk | 5/20/2008 | 300 | 7.5500 |
| Purchase | Com Stk | 6/9/2008 | 1,500 | 5.8600 |
| Purchase | Com Stk | 6/9/2008 | 100 | 5.8700 |
| Purchase | Com Stk | 6/9/2008 | 1,000 | 5.8800 |
| Purchase | Com Stk | 6/9/2008 | 400 | 5.8900 |

399 Park Avenue
New York, NY 10022
Tel: (212) 937-7220
Fax: (212) 230-8888

*Counsel for Defendants*