Michael G. Bongiorno
Keith Bradley
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
212-230-8800

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YARON GISSIN, Individually and on Behalf of All Those Similarly Situated, : : : | |
| : | No. 09 CV 9338 (SAS) |
| Plaintiff, : | |
| : | ORAL ARGUMENT REQUESTED |
| v. : | |
| : | |
| DONALD L. ENDRES, DANNY C. HERRON and BRYAN D. MEIER, : : | |
| : | |
| Defendants. : | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................1

ALLEGATIONS OF THE COMPLAINT.......................................................................2

      A.    The Parties .................................................................................2

      B.    VeraSun's Ethanol Business .....................................................3

      C.    The Events of Summer 2008......................................................4

      D.    The Alleged Misrepresentations ................................................7

ANALYSIS.......................................................................................................................10

    I.    Plaintiffs Allege No Actionable Misrepresentations ..............................11

      A.    Plaintiffs Allege No Actionable Misstatements.........................12

      B.    Plaintiffs Allege No Duty to Disclose VeraSun's Supposed Financial Problems ................................................................17

    II.    Plaintiffs Fail to Support the Necessary Inference of *Scienter* .............................19

    III.    Plaintiffs' Section 20(a) Claim Must Also Be Dismissed .....................25

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

Pages(s)

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87
    (2d Cir. 2007)..................................................................................................2, 10

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)......................................................................................2, 10

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998).....................................................................................10

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ...................................................................................21

*Edward B. Beharry & Co. v. Bedessee Imports Inc.*,
    No. 09-CV-0077 (DLI), 2010 WL 1223590 (E.D.N.Y. Mar. 23, 2010) ............................4

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004).....................................................................................11

*Fort Worth Employers' Ret. Fund v. Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009)...............................................................13, 15, 16

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ...........................................................................14, 15

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991).......................................................................................6

*In re Bausch & Lomb, Inc. Sec. Litig.*,
    No. 01-CV-6190-CJS, 2003 WL 23101782 (W.D.N.Y. Mar. 28, 2003)............................6

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009).........................................................................16

*In re Centerline Holdings Co. Sec. Litig.*,
    678 F. Supp. 2d 150 (S.D.N.Y. 2009).........................................................8, 10, 12, 17

*In re Cerner Corp. Sec. Litig.*,
    425 F.3d 1079 (8th Cir. 2005) .................................................................................24

*In re Corning Inc. Sec. Litig.*,
    No. 04-2845-CV, 2005 WL 714352 (2d Cir. Mar. 30, 2005)...........................................18

*In re Cross Media Mktg. Corp. Sec. Litig.*,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004)...............................................................13

*In re Duane Reade Sec. Litig.*,
    No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003),
    *aff'd*, 107 Fed. App'x 250 (2d Cir. 2004)...............................................19

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)..............................................................11

*In re GeoPharma Securities Litigation*,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005)......................................................13, 19

*In re MBIA, Inc., Securities Litigation*,
    No. 08-264, 2010 WL 1253925 (S.D.N.Y. Mar. 31, 2010).............................23

*In re NTL, Inc. Securities Litigation*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004)................................................................13

*In re Northern Telecom Ltd. Securities Litigation*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)......................................................18, 19

*In re NovaGold  Resources Inc. Securities Litigation*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)......................................................14, 15

*In re PXRE Group, Ltd., Securities Litigation.*,
    600 F. Supp. 2d 510 (S.D.N.Y.),
    *aff'd sub nom. Condra v. PXRE Group Ltd.*,
    2009 WL 4893719 (2d Cir. Dec. 21, 2009)...................................................23

*In re Sierra Wireless, Inc. Securities Litigation*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007)......................................................11, 14

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)...............................................................18

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................20

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)..........................................................................2, 3

*Miller v. Champion Enterprises, Inc.*,
    346 F.3d 660 (6th Cir. 2003) ..........................................................................15

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)..................................................................20, 23

*Phillips v. Scientific-Atlanta, Inc.*,
 374 F.3d 1015 (11th Cir. 2004) ....................................................................25

*Plumbers & Steamfitters Local 773 Pension Fund v.*
 *Canadian Imperial Bank of Commerce*,
 No. 08-8143, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010).........................21, 22

*Pollio v. MF Global, Ltd.*,
 608 F. Supp. 2d 564 (S.D.N.Y. 2009)..............................................................18

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004)......................................................................12, 21

*South Cherry Street, LLC v. Hennessee Group LLC*,
 573 F.3d 98 (2d Cir. 2009).................................................................10, 19, 20

*Santa Fe Industries, Inc. v. Green*,
 430 U.S. 462 (1977)...........................................................................................2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)....................................................................................20, 22

*Western Washington Laborers-Employers Pension Trust v. Panera Bread Co.*,
 No. 08-00120, 2010 WL 1006259 (E.D. Mo. Mar. 16, 2010)..........................15

## STATUTES

15 U.S.C. § 78u-4 ...............................................................................................10

15 U.S.C. § 78u-5 ....................................................................................... *passim*

## LEGISLATIVE MATERIAL

H.R. Conf. Rep. No. 104-369,(1995).................................................................13

Defendants Donald L. Endres, Bryan D. Meier, and Danny C. Herron (collectively "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Consolidated Class Action Complaint ("Compl.") filed by Lead Plaintiffs Wayne Mitchell and Son Nguyen ("Plaintiffs"), pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").

## PRELIMINARY STATEMENT

On September 16, 2008, VeraSun Energy Corporation ("VeraSun") announced that it expected to lose $60 to $100 million for the quarter that would end on September 30, due to the combination of a drop in the price for VeraSun's main product, ethanol, and an increase in the Company's cost for its main input, corn, after a period of extraordinary volatility in the price of corn.  Plaintiffs, blessed with perfect hindsight, complain that VeraSun should have disclosed the expected loss one month earlier and that its failure to do so amounts to fraud.  But it is inexplicable why these Defendants would have wanted to deceive the market about such an expected loss, if they had known somehow about it earlier; and indeed Plaintiffs make no allegations showing that Defendants knew about the expected loss by mid-August (or even that it was possible to have known).  The price of corn had only just begun to drop after a period of significant increases, and could just as well have increased again.

In an effort to broaden their putative Class Period, Plaintiffs also claim more generally that VeraSun hid a "catastrophic" liquidity crisis—in which, oddly for a "crisis," it had $28 million in cash on hand and an available credit line of $85 million (which it apparently did not need, as there is no allegation that it drew down the credit in that timeframe)—during the spring and summer of 2008.  Although Plaintiffs repeatedly assert that Defendants claimed VeraSun's liquidity was "strong," Plaintiffs do not identify any statement in which Defendants actually said such a thing.  Indeed, Plaintiffs identify no false or misleading statements of fact at all; and they

do not dispute that all of VeraSun's financial reporting was perfectly accurate.  They can only

point to general predictions and optimistic suggestions concerning working capital and other

matters, all of which Defendants issued with careful reminders about various risks of investing in

VeraSun (including all the risks that materialized in September 2008, and particularly including

the risks from VeraSun's use of corn derivatives).  Under the PSLRA's safe harbor, Defendants

cannot be liable for such forward-looking statements.

Ultimately, VeraSun was felled by extremely difficult market conditions, including the

credit crisis, that it did not foresee.  Plaintiffs claim VeraSun was especially vulnerable to those

conditions because, having invested more on expanding capacity than Plaintiffs, in hindsight,

think was wise, the Company had a heavy debt load and a lean balance sheet; and because its

corn procurement activities involved some risk.  But these risks were fully disclosed, and

Plaintiffs cannot bootstrap such business reversals into securities fraud claims.

## ALLEGATIONS OF THE COMPLAINT

This discussion assumes non-conclusory allegations in the complaint to be true, *Ashcroft*

*v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), and it relies on documents proper for consideration on a

motion to dismiss, including documents "incorporated into the complaint by reference ... [or]

documents possessed by or known to the plaintiff and upon which it relied in bringing the suit,"

*ATSI Commc'ns, Inc. v. Shaar Fund*, *Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) and materials

appropriate for judicial notice, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).[1]

A.      The Parties

VeraSun is now bankrupt, but it was, in 2008, one of the country's largest distillers of

ethanol.  Compl. ¶¶ 2, 33.  Defendant Don Endres was VeraSun's chief executive officer,

---

[1] The relevant documents are included as exhibits to the Declaration of Michael G. Bongiorno
("Bongiorno Decl.").  The Complaint is attached as Exhibit 1 to the Bongiorno Declaration.

Defendant Danny C. Herron its chief financial officer, and Defendant Bryan D. Meier its chief accounting officer. *Id.* ¶¶ 21-22.

Plaintiffs Wayne Mitchell and Son Nguyen held VeraSun shares that they acquired after March 12, 2008. *Id.* ¶¶ 17-18.  They purport to represent a class of all those who acquired VeraSun shares between March 12 and September 16, 2008 (the "Class Period"), and were damaged thereby. *Id.* ¶ 23.

B.     VeraSun's Ethanol Business

VeraSun manufactured ethanol, using corn as the main input. *Id.* ¶ 31.  As Plaintiffs are well aware, and as VeraSun disclosed, VeraSun's profit or loss depended primarily on the difference (the "spread") between the price it got for ethanol and what it paid for corn. *Id.* ¶ 58. The ethanol price depends on the market for gasoline, because ethanol's main use is as an automotive fuel. *Id.* ¶¶ 31, 58.  The market price of corn is determined by supply factors such as weather and by the strength of demand. *Id.* ¶ 58.  Thus, the prices of input and output are not necessarily correlated, and a company like VeraSun is always vulnerable to the risk of low or negative margins, as it also repeatedly disclosed.[2]  As VeraSun further disclosed, it sought to manage those risks using derivatives, which "can themselves result in losses when a position is purchased in a declining market or a position is sold in a rising market."  2007 10-K, at 13.

During 2007 and 2008, VeraSun rapidly expanded its refining capacity.  In early 2008, it was constructing new plants of its own, as well as continuing construction on refineries started by U.S. BioEnergy, a rival it acquired on April 1. *Id.* ¶¶ 36, 39.  This expansion was, obviously, capital-intensive. *Id.* ¶ 41.  VeraSun reported to investors its gross long-term debt of $908

---

[2] *E.g.* Form 10-K, VeraSun Energy Corp., at 50-51 (Mar. 12, 2008) ("2007 10-K") (Ex. 3); Form 10-Q, VeraSun Energy Corp., at 26-27 (May 12, 2008) ("Q1 10-Q") (Ex. 4); Form 10-Q, VeraSun Energy Corp., at 45-46 (Aug. 11, 2008) ("Q2 10-Q") (Ex. 5).  This Court may take "judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC." *Kramer*, 937 F.2d at 774.

million as of the end of 2007 (2007 10-K, at 34), and it took on debt of $525 million when it acquired U.S. BioEnergy (Compl. ¶ 35).  The Company explained that servicing this debt, as well as investing in new facilities, was a major use for cash (2007 10-K, at 45), and it warned investors that it expected debt service to consume $104 million of cash during 2008 (*id*. at 46).

      C.      <u>The Events of Summer 2008</u>

The acquisition (Compl. ¶ 36) took place at a challenging time for ethanol producers: the corn-ethanol spread had narrowed, by early 2008, to just $0.50 (*id*. ¶ 59).  Corn prices were still rising, to $5-6 per bushel by June (*id*. ¶ 62), and the market was unusually volatile (*id*. ¶¶ 6, 8). While ethanol prices also rose in the first half of 2008, there was no guaranty that they would continue to do so; and VeraSun warned investors that "[h]istorically, we have not been able to pass along increased corn costs to our ethanol customers."  Q1 10-Q, at 26.

VeraSun's management undertook measures to ensure that it would survive and hopefully even grow despite these adverse conditions.  In April and May, Defendants negotiated a $125 million line of credit from a major bank.  Compl. ¶ 47.  VeraSun also retained a consultancy, AlixPartners, with expertise in "how to save money and protect cash in order to give companies the ability to thrive ...."[3]  To conserve cash, VeraSun stretched out payments to vendors and intensified its efforts to collect from customers.  *Id*. ¶¶ 43-44, 55.  VeraSun's careful husbanding of cash was fruitful: by the end of the second quarter, it had maintained its program of investments, had started up an additional refinery, and was on track to start plants at Dyersville and Janesville later in the year, while preserving $28 million in cash and $85 million

---

[3] AlixPartners, *Cash Management, Accounts Receivable/Accounts Payable* (Ex. 6).  The Court may consider AlixPartners' website on this motion because Plaintiffs relied on its content to insinuate that VeraSun must have used the firm for an "urgent, high-impact situation."  Compl. ¶ 42 (quoting website); *see Edward B. Beharry & Co. v. Bedessee Imports Inc.*, No. 09-CV-0077 (DLI)(JMA), 2010 WL 1223590, at *6 (E.D.N.Y. Mar. 23, 2010) (taking notice of websites on motion to dismiss, where plaintiffs had referred to them and relied on them in complaint).  As the website demonstrates, AlixPartners offers many services beyond what Plaintiffs cite.

on its line of credit and recording net quarterly income of $73 million.[4]  Meanwhile, VeraSun accurately disclosed a detailed quarterly breakdown of its quarterly cash flow and predicted that its working capital needs would increase.[5]

Market conditions continued to worsen in late June, as the corn price rose even further. Compl. ¶ 6.  On June 25, VeraSun delayed starting up three refineries that had been scheduled to come on line during the quarter but might not be able to produce ethanol profitably as a result of the narrowed spread.  *Id.* ¶ 53.[6]  Plaintiffs assert that this delay proved VeraSun was running short of cash (*id.* ¶ 54); but there is no allegation that VeraSun delayed work at the Dyersville and Janesville refineries (*id.* ¶ 52), which were scheduled for start-up later in the year (Q2 10-Q, at 33), presumably after the spread recovered.

VeraSun had long tried to protect itself against fluctuations in the corn price by purchasing corn on long-term contracts, and by transacting nearer-term futures, as it fully and repeatedly disclosed (*e.g.* 2007 10-K, at 6-7).  VeraSun further disclosed that such transactions were risky.  *E.g. id.* at 13.  In addition, VeraSun would take short positions in corn to hedge against falling corn prices.  Compl. ¶ 63.  As the price of corn rose, VeraSun purchased long positions, including accumulator contracts, that would benefit it if the price continued to climb. *Id.* ¶ 65.  Meanwhile, the price rose to $8 in July, $3 higher than it had been in April and May (*id.* ¶ 62); the margin calls on the short position grew, reaching over $1 million per day (*id.* ¶ 63); and VeraSun therefore chose to unwind its existing short position (*id.*).  On August 12,

---

[4] Compl. ¶ 40 (noting investments reported on Q2 10-Q); *id.* ¶ 52 (cash primarily used for investment); *id.* ¶ 49 (company used only $40 million of credit line ); Q2 10-Q, at 33 (reporting refinery construction); *id.* at 3 (reporting $28 million in cash); *id.* at 37 ($73 million EBITDA).

[5] 2007 10-K, at 46, 58; Q1 10-Q, at 16, 25; Q2 10-Q, at 5, 42.

[6] Plaintiffs allege that the real reason for the delay was a lack of cash to fund the start-up; but the witness from whom they got the idea cannot have known the real reason, because he or she stopped working on refinery construction matters after March 2008.  Compl. ¶ 54.

Mr. Meier informed analysts that because of July's high corn price, VeraSun would have a third-quarter loss of about $25 million on the short positions.[7]

Unfortunately for VeraSun, the corn price then began to fall a few weeks after it had exited the short position.  *Id.* ¶ 67.  Plaintiffs allege that because of the Company's accumulator contracts, a falling corn price caused it substantial losses.  An accumulator contract, like every forward-purchase contract, involves an obligation to buy a certain amount of corn at a specified future date (or dates), at a price set in the contract.  *Id.* ¶ 66.  The amount of corn to be purchased on the specified date depends on the course of prices over the life of the contract.  *Id.*  Each week, if the futures market price for the specified date is above the contract's set price, the purchaser becomes obligated to buy a certain amount of corn.  If the futures price drops by too much, the purchaser becomes obligated to buy twice that amount—still at the contract's set price. *Id.*  Thus, over the twelve-month term of these contracts (*id.* ¶ 65), on a weekly basis VeraSun acquired progressively more obligations to purchase corn at the set prices, somewhere between $6.50 and $7 per bushel.  *Id.* ¶ 64.

The corn price continued to decline over the course of August and September, with the result that VeraSun's effective corn purchase cost for the third quarter was $6.75-$7.00 per bushel, significantly higher than in the second quarter.  *Id.* ¶ 81.  Meanwhile the ethanol price at the end of August stood at $2.35-$2.45 per gallon, significantly below where it had been just two

---

[7] Compl. ¶ 97 (noting "mark-to-market gain … which will reverse in the third quarter"); Tr., VeraSun Energy Corp. Q2 2008 Earnings Call, at 3 (Aug. 12, 2008) ("Q2 Call") (Ex. 7).  The court may, on this motion, consider the full content of this and other conference calls from which Plaintiffs have quoted extensively as the sources of most of the alleged misstatements.  *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (source of alleged misrepresentation is "integral to the complaint"); *In re Bausch & Lomb, Inc. Sec. Litig.*, No. 01-CV-6190-CJS, 2003 WL 23101782, at *6 n.6 (W.D.N.Y. Mar. 28, 2003) (transcript of conference call with investors proper to consider on motion to dismiss).

months previously.[8]  The combination of higher corn costs and lower ethanol prices caused

VeraSun eventually to anticipate a loss of between $60 and $100 million for the third quarter,

which it promptly announced on September 16, 2008.  Sept. 16 Release.  The Company's share

price plunged, and credit rating agencies downgraded its debt.  Over the course of October 2008,

as available credit evaporated in the wake of the failure of Lehman Brothers, VeraSun ran out of

cash; and on October 31, 2008, it filed for bankruptcy.  Compl. ¶ 106.

> D.     The Alleged Misrepresentations

Plaintiffs, in their effort to concoct fraud from these business reversals by picking back

through the Company's conference calls and SEC filings, tellingly do not allege that any of the

historical financial data reported by VeraSun, or provided by Defendants in any of their

statements—*e.g.* VeraSun's end-of-quarter cash balance, net debt, revenue, or average quarterly

corn cost—were inaccurate.  Indeed, Plaintiffs use VeraSun's financial reports as sources for

facts about VeraSun's cash flow during the second quarter of 2008.  *E.g. id.* ¶ 40.

Moreover, Plaintiffs cite no actual statements to support their repeated, conclusory

assertion that Defendants claimed VeraSun's "liquidity was strong" (*e.g. id.* ¶ 83).  Instead,

Plaintiffs misquote, and selectively quote, statements and read into them claims that Defendants

did not actually make.  For example, while Plaintiffs characterize Mr. Herron's statement (itself

an inactionable general and forward-looking statement) that "we think we'll be just fine" as an

assurance of "strong" liquidity (*id.* ¶ 95), he actually said,

> That would be our current view given market conditions.  I mean, obviously, this
> is an extremely volatile market. As I mentioned in my remarks, the beginning of
> June, we had corn at sub $6 or around $6, by the end of June, we had it at almost
> $8 … We had ethanol on June 16 was $2.35 a gallon, and I want to say, July 4th it
> was $3.25 a gallon.  So all over the board on the volatility, but based on our

---

[8] Form 8-K, VeraSun Energy Corp. (Sept. 16¸ 2008) (announcing expected loss and attributing it
to combination of high corn costs and low ethanol prices) ("Sept. 16 Release") (Ex. 8).  This
press release is the basis of Complaint ¶ 81 and is therefore proper to consider on this motion.

current view and what we know, yes, we think we'll be just fine.  Q2 Call, at 7.

More generally, to support the claim that VeraSun should have disclosed earlier the liquidity problems that only materialized later, and should have disclosed its expected losses in August instead of September, Plaintiffs contend that certain vague (mostly forward-looking) statements were misleading, such as the following examples:[9]

(a)  Descriptions of management's intentions.  Compl. ¶ 84 ("we want to expand [the credit line] instantly to 210"); *id*. ¶ 85 ("we're going to run a prudent balance sheet"); *id*. ¶ 93 ("The merger is expected to create ..."); *id*. ¶ 100 ("intends to use the net proceeds ...").

(b)  Vague predictions about VeraSun's ability to finance investment.  *Id*. ¶ 83 ("we will be in a position to fund those capital investments ..."); *id*. ¶¶ 84, 92, 95.

(c)  Predictions that management planned to use a credit line as a "liquidity insurance policy" (*id*. ¶¶ 87-88, 90).

Plaintiffs also cite a Form S-3 that VeraSun filed on August 14, for a $750 million share offering.  They suggest that this was intended "to quickly raise capital in an effort to prevent a disastrous impact from the huge losses" (*id*. ¶ 73), as though VeraSun were attempting to sell shares on the basis of the Form S-3.  But the form indicated that it was not an effective registration and that VeraSun was not yet permitted, and was not offering, to sell any shares.  Form S-3, VeraSun Energy Corp., at 2-3 (Aug. 14, 2008) ("Form S-3") (Ex. 11).  Certainly VeraSun could not have expected to "quickly raise capital" (Compl. ¶ 73) under the Form S-3.

The forward-looking statements cited were also accompanied by specific and meaningful cautionary language.  For example, on each earnings call, Defendants advised analysts that they

---

[9] Plaintiffs also appear to rely on a more general notion of non-disclosure (*e.g.* Compl. ¶ 89), but they suggest no duty to disclose other than that the cited statements were allegedly misleading or incomplete.  *See In re Centerline Holdings Co. Sec. Litig.*, 678 F. Supp. 2d 150, 156 (S.D.N.Y. 2009) (duty could arise from insider trading, statutory or regulatory requirements, and obligation to make any actual statement "complete and accurate").

would be making forward-looking statements during the call and referred them to the risk discussions in VeraSun's reports.[10]  Among copious warnings, those reports said that:

(a) VeraSun's expansion strategy "depend[ed] on prevailing market conditions ... and expectations of future market conditions," including the ethanol and corn prices, and might require it to find "[a]dditional financing" (2007 10-K, at 14);

(b) VeraSun's "high level of debt" could "requir[e] the dedication of a substantial portion of cash flow from operations ... thereby reducing the availability of cash flow for working capital, capital expenditures and other general business activities" (*id.* at 23);

(c) VeraSun's debt could "limit[] the flexibility in ... reacting to[] changes in the business" and "limit[] our ability to engage in transactions deemed appropriate" (*id.*).

With respect to corn derivatives, the Company warned investors of exactly the risks about which Plaintiffs complain they did not know.  It disclosed, each quarter, how much corn it had purchased on forward contracts of various durations.  Q1 10-Q, at 27; Q2 10-Q, at 46.  While Plaintiffs call 12-month contracts "highly speculative … Madoff stuff" (Compl. ¶ 65), VeraSun disclosed that "[o]ur corn requirements can be contracted for up to a year in advance on fixed-price forward contracts" (2007 10-K, at 7).  Plaintiffs complain that VeraSun did not disclose that it was "locked … into future corn purchases at prices above the then-current market price" (Compl. ¶ 98), but the Company had said that its contracts, committing it to buy corn "on a forward basis," "**can themselves result in losses when a position is purchased in a declining**

---

[10] *See* Ex. 2 (excerpting highlights); Q2 Call at 2; *id.* at 7 (slide); Tr., VeraSun Energy Corp. Q1 2008 Earnings Call, at 2 (May 13, 2008) ("Q1 Call") (Ex. 9); *id.* at 6 (slide); Tr., VeraSun Energy Corp. 2007 Earnings Call, at 2 (Mar. 12, 2008) ("2007 Call") (Ex. 10).  As noted above (*supra* n.7), the Court should consider these calls, as the full context of the alleged misrepresentations.  In addition, "the court shall consider ... any cautionary statement accompanying the forward-looking statement, which [is] not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e).

**market**" (2007 10-K, at 13) (emphasis added).  It also warned that such contracts could cause losses, depending on "the prices involved" and any "change in the … differential between the price of the commodity … and the actual prices paid or received by us."  2007 10-K, at 13.[11] Finally, while Plaintiffs suggest that VeraSun should have hedged the accumulator contracts (Compl. ¶¶ 69-72), it had already alerted investors that it might "vary the amount of hedging … we undertake, and … choose not to engage in hedging transactions at all" (2007 10-K, at 13).

## ANALYSIS

"[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim for relief that is plausible on its face.'"  *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).  "[T]he court need not accord legal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness."  *Centerline Holdings*, 678 F. Supp. 2d at 155-56.

To state a claim for violation of Section 10(b) or Rule 10b-5, Plaintiffs must sufficiently allege that Defendants (1) made misstatements or omissions of material fact, (2) with *scienter*, (3) in connection with the purchase or sale of securities, (4) upon which Plaintiffs relied, (5) causing their loss.  15 U.S.C. § 78u-4(b); *ATSI Commc'ns*, 493 F.3d at 105.  For their Section 20(a) claim, they must allege "(1) a primary violation …; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation."  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). For both claims, the Complaint must also comply with the heightened pleading requirements of Rule 9(b) and the PSLRA.  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,

---

[11] Plaintiffs assert, without any source, that the accumulators forced VeraSun to buy more corn than its business required.  Compl. ¶ 66.  But VeraSun had also disclosed that the financial risk from derivatives would depend on "our ability to sell sufficient products to use all of the corn … for which we have futures contracts."  2007 10-K, at 13.

375 F.3d 168, 187 (2d Cir. 2004).  In particular, it must plead sufficient particularized facts to identify the alleged fraudulent statements and explain why they were fraudulent.  *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 372 (S.D.N.Y. 2007).  The Court should consider the alleged statements in the context of the Complaint and of other information appropriate for judicial consideration, and if other cognizable documents "contradict the allegations of the … complaint, the documents control."  *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008).  Both the PSLRA and Rule 9(b) further require that a plaintiff plead with particularity facts giving rise to a strong inference that the defendants acted with *scienter*.  *Eternity Global Master Fund,* 375 F.3d at 187.

Plaintiffs fail to meet these requirements.  Part I below demonstrates that none of the alleged misrepresentations is actionable.  Most of the alleged statements were forward-looking, and Defendants carefully warned investors of the potential risks associated with such predictions.  Defendants had no duty to go further and disclose the supposed liquidity crisis, or to disclose the expected third-quarter loss any earlier, especially because there are no allegations that any of their factual statements were false.  In Part II, Defendants show that the Complaint fails to supply the necessary inference of *scienter*: Defendants had no motive for fraud, and they disclosed VeraSun's expected losses in a timely fashion.  Plaintiffs' extensive recitation of circumstantial allegations from confidential witnesses is simply irrelevant, because even where the witnesses possibly are in a position to have known, the allegations do nothing to show that any Defendant knew of any liquidity crisis.  Finally, Part III shows that Plaintiffs' Section 20(a) claim, which depends on their claim of securities fraud, must also be dismissed.

## I.      Plaintiffs Allege No Actionable Misrepresentations

Plaintiffs complain that Defendants misrepresented a supposedly "catastrophic liquidity crisis" beginning in March and VeraSun's "risky derivative transactions in corn" that, Plaintiffs

say, caused its third-quarter losses.  Compl. ¶ 95.  They complain that VeraSun invested too

much on expansion (*id*. ¶¶ 3, 40-41), so that it didn't have enough cash to hedge the corn price as

it rocketed to $8 and then collapsed (*id*. ¶¶ 68-69).  These hyperbolic conclusions find no support

in the factual allegations—VeraSun had $28 million in cash at the end of the second quarter (Q2

10-Q, at 3) and $85 million available on one credit line alone (Compl. ¶ 49), as Plaintiffs do not

dispute.  Even more importantly at this stage, Plaintiffs fail to allege any actual misrepresentation

by Defendants with respect to these risks.

It is not enough to allege that Defendants did not discuss the supposed "liquidity crisis";

"[s]ilence, absent a duty to disclose, is not misleading[,]" *Centerline Holdings*, 678 F. Supp. 2d

at 156.  Plaintiffs cite no statement in which any Defendant actually said VeraSun's liquidity was

"strong"; they simply *characterize* Defendants' alleged statements (all of which were forward-

looking) that way, as if the word "strong" satisfied their pleading burden.  For example, Plaintiffs

quote VeraSun as saying "we believe that our existing sources of capital will be sufficient to

fund our anticipated working capital requirements" and interpret this statement (with no

justification) as "describ[ing] the Company's liquidity position as being strong."  Compl. ¶ 92.

A.    Plaintiffs Allege No Actionable Misstatements

Virtually all of the statements that Plaintiffs cite as misleading for failing to discuss a

liquidity crisis were unambiguously forward-looking.[12]  They are protected by the PSLRA's safe

harbor, so long as they were accompanied by meaningful cautionary statements (which they

were) or if Plaintiffs fail (as indeed they do, *see infra* Part II) to support the strong inference that

Defendants had "actual knowledge" that their statements were false.  15 U.S.C. § 78u-5(c)(1).

These criteria are disjunctive: the first depends only on the adequacy of the cautions, and

---

[12] Many, like statements that "we're going to run a prudent balance sheet" (*id*. ¶ 85) or that the merger "is expected to create" a stronger business (*id*. ¶ 93), are also inactionable "expressions of puffery and corporate optimism," *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

"[c]ourts should not examine the state of mind of the person making the statement."[13]

Under the PSLRA, a forward-looking statement is, among other things, any "statement containing a projection of revenues, ... or other financial items," any "statement of the plans and objectives of management for future operations," or any "statement of future economic performance."  15 U.S.C. § 78u-5(i).  With respect to the March 12 conference call, Plaintiffs acknowledge that the supposedly false statements concerned the future: "VeraSun's ability to fund capital investments ***throughout the upcoming year***."  Compl. ¶ 86.  For at least one other statement, the Complaint misleadingly alters the verb tense of a partially quoted forward-looking statement.  On May 13, Mr. Endres did not "assure[] investors" that VeraSun "*had* 'liquidity flexibility ....'" (*id*. ¶ 88 (emphasis added)).  In fact, in response to a question about whether he "***expect[ed]***" to use the new credit line for "construction capital," he *predicted* that, "depend[ing] on your margin assumptions … and where the market ends up going," the new credit line (which would not be available until May 31 (*id*. ¶ 47)) "provides us with some liquidity flexibility."  Q1 Call at 22.  Nearly all the remaining statements were also "clearly written in the future tense," *Winick v. Pac. Gateway Exch., Inc.*, 73 Fed. App'x 250, 253 (9th Cir. 2003); made predictions that depended on market performance, which is "necessarily contingent on future events," *id*.; or clearly announced management's plans and intentions.  *See, e.g.*,

Compl. ¶ 83 ("***expectation*** of cash flows"; "***we feel we will be***" able to fund investments);

*id*. ¶ 84 ("We ***think*** working capital ***will*** stay ***about*** where it is ***for the balance of the year***"; "we ***want*** to expand" the credit line);

*id*. ¶ 85 ("We're ***going to run*** a prudent balance sheet");

---

[13] H.R. Conf. Rep. No. 104-369, at 44 (1995); *see Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 232 & n.2 (S.D.N.Y. 2009); *In re GeoPharma Sec. Litig.*, 399 F. Supp. 2d 432, 448 (S.D.N.Y. 2005); *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 268 (S.D.N.Y. 2004); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004).

*id*. ¶ 88 ("[W]e *will draw on it*" to cover the "large increase in working capital requirements.");

*id*. ¶ 90 (credit line "*will provide* additional liquidity sources");

*id*. ¶ 92 ("based on current market conditions ... we *believe* that our existing sources of capital *will be sufficient* to fund *anticipated* working capital requirements ... [in] the *next 12 months*");

*id*. ¶ 93 (merger "*is expected* to create" a stronger business);

*id.* ¶ 95 ("based on our current view . . . we *think we'll be* just fine");

*id*. ¶ 96 ("*potential* profitability improvement over the *next 18 months*");

*id*. ¶ 97 (alleging Defendants predicted that the high corn price "*would have* a minimal impact");

*id*. ¶ 100 ("we *intend* to use the net proceeds of any offering") (emphases altered throughout). As predictions of VeraSun's financial performance or pronouncements about management's intentions, these statements all "fall[] squarely in the middle of one of the categories of 'forward-looking statements,'" *Harris v. Ivax Corp.*, 182 F.3d 799, 804 (11th Cir. 1999).

These statements are protected because they were accompanied by "meaningful cautionary statements identifying important factors" of risk, 15 U.S.C. § 78u-5(c)(1)(A).  To provide protection, cautions must disclose the relevant categories of risk so that "a reasonable investor could [not] have been misled into thinking that the risk that materialized … did not actually exist."  *Sierra Wireless*, 482 F. Supp. 2d at 380 (quoting *Halperin v. eBanker USA.com*, 295 F.3d 352, 359 (2d Cir. 2002)).[14]  The warnings "need not predict all of the details of the contingency that came to pass"; "a higher level of generality ... is sufficient."  *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009); *see Harris*, 182 F.3d at 807 (statement "protected by the safe harbor" even if it "fail[s] to include the particular factor that ultimately causes [it] not to come true") (citing H.R. Conf. Rep. 104-369, at 44).

---

[14] Although *Halperin* actually developed the Second Circuit's "bespeaks caution" doctrine, courts in this district have applied *Halperin*'s analysis to the PSLRA safe harbor, as in *Sierra Wireless*.

Defendants not only provided copious warnings; they affirmatively disclosed exactly the risks that Plaintiffs say they concealed.  Although Plaintiffs allege that VeraSun failed to disclose that expansion was hurting its financial position (Compl. ¶¶ 86, 89), VeraSun warned investors that its expansion was financially risky and that the Company might need to raise more money to fund it, depending on market conditions like the corn-ethanol spread.  *Supra* at 7 (quoting 2007 10-K at 14).  *Cf. NovaGold*, 629 F. Supp. 2d at 293 (general disclosure of risk of increased capital costs sufficient, because that was "risk[] which ultimately materialized").  Similarly, while Plaintiffs claim that VeraSun hid the risk of cash flow problems (Compl. ¶ 89), in fact VeraSun not only specifically and accurately disclosed its cash balance and needs[15] but also made clear that servicing its large debt might require so much cash that it could not respond adequately to market changes.  *Supra* at 8 (quoting 2007 10-K, at 23).  VeraSun also repeatedly alerted investors (although this should hardly have been necessary) that its liquidity would depend on the results of operations, its debt level, and its capital expenditures; and it specifically noted that it was spending money on "plant construction and the purchase of equipment."[16]

These warnings were at least as specific as those that courts have found adequate to put investors on notice of the risks that might derail a promising prediction.[17]  And Defendants reminded investors of them and incorporated them by reference at the beginning of every earnings call and report—a method of providing cautionary language that the PSLRA expressly

---

[15] 2007 10-K, at 33, 45-46; Q1 10-Q, at 3, 24-25; Q2 10-Q, at 3, 42-43.

[16] 2007 10-K, at 46; Q1 10-Q, at 25; Q2 10-Q, at 43.

[17] *See Miller v. Champion Enters., Inc.*, 346 F.3d 660, 677-78 (6th Cir. 2003) (one-sentence observation that housing inventories might be high); *Harris*, 182 F.3d at 810-11; *W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co.*, No. 08-00120, 2010 WL 1006259, at *5-6 (E.D. Mo. Mar. 16, 2010) (cautions "referr[ed] in general terms to the specific risks that ultimately materialized"); *Biovail*, 615 F. Supp. 2d at 232 (note of "the difficulty of predicting [FDA and other] regulatory approvals" was sufficient caution).

condones.[18]  15 U.S.C. § 78u-5(c)(2) (oral forward-looking statement may refer to cautionary language in "a readily available written document"); *see Biovail*, 615 F. Supp. 2d at 232 (conference call speaker referred to risk factors discussed in earnings report).  Defendants also regularly mentioned more specific risks and qualifiers.  *E.g.* 2007 Call at 9 ("Based on our current expectations of cash flows ..."); *id*. at 13 ("a lot of that answer will depend on the margins"); Q1 Call at 22 ("that always depends on ... where the market ends up going"); Q2 10-Q, at 43 ("[C]ash flows from future operations and the amount and timing of our future financing needs are inherently uncertain").[19]  Taken in context, Defendants' alleged misstatements "not only bespeak caution, they shout it from the rooftops."  *Halperin*, 295 F.3d at 360.

With respect to the accumulator contracts, VeraSun's warnings were, if anything, even more explicit.  In addition to alerting investors to the risks from derivatives, VeraSun explained that it used long-term (one-year) purchase contracts; described how much of its needs it supplied through such contracts; cautioned that such contracts might result in losses if the price of corn declined; and disclosed that it might not have hedges on its contracts.[20]  These cautions were more than enough to inform investors that a 60% fluctuation in corn prices, as took place in 2008, could damage VeraSun.  *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 415-16 (S.D.N.Y. 2009) (discussion of company's hedging against "fluctuating market conditions" informed investors sufficiently of risk from rising and falling prices).

Because of the extensive cautionary language that Defendants provided, their predictions and statements of intention are protected under the PSLRA's safe harbor and are also "immaterial as a matter of law," *Halperin*, 295 F.3d at 357 (applying related "bespeaks caution"

---

[18] 2007 Call at 2; Q1 Call at 2 & slides; Q2 Call at 2 & slides.

[19] This warning appeared in the second-quarter 10-Q as *the sentence after* the prediction that Plaintiffs label a misrepresentation (Compl. ¶ 92).

[20] 2007 10-K, at 13; Q1 10-Q, at 27; Q2 10-Q, at 46.

doctrine).  Therefore, the statements in paragraphs 83 through 100 are inactionable.

      B.    <u>Plaintiffs Allege No Duty to Disclose VeraSun's Supposed Financial Problems</u>

      Despite having being warned repeatedly of the risks of investing in VeraSun, Plaintiffs contend that Defendants should specifically have discussed a supposed "liquidity crisis" (Compl. ¶¶ 86, 89) and should have announced, one month before they did, the expected losses arising in part from the accumulator contracts.  Plaintiffs do not explain why Defendants had any duty to disclose such matters.  "[D]efendants will only be liable for violating the securities laws when they are 'subject to a duty to disclose the omitted facts,'" *Centerline Holdings*, 678 F. Supp. 2d at 156; and such a duty arises only in specific circumstances, *id.*, none of which is present here.[21]

      1.    No Duty to Disclose "Liquidity Crisis"

      Defendants' statements were "complete and accurate," *id*.  VeraSun reported its detailed financial position—including its declining cash balance—at the end of every quarter in Forms 10-K and 10-Q filed at the SEC, and Plaintiffs do not allege that any of those figures were wrong.  Defendants also presented financial data during quarterly earnings calls, and there is no allegation that any of the financial information that Plaintiffs mention—such as the amount of VeraSun's capital expenditures (Compl. ¶ 83), the nature of the covenants on U.S. BioEnergy's debt (*id.* ¶ 84),[22] or the amount of VeraSun's existing working capital (*id.* ¶ 88)—was incorrect.

      So long as Defendants presented VeraSun's financial condition accurately, they "were

---

[21] "A duty to disclose arises …: (1) [W]hen a corporate insider trades on confidential information; (2) When a statute or regulation requir[es] disclosure; and (3) [W]hen a corporation … make[s] a disclosure … there is a duty to make it complete and accurate." *Centerline Holdings*, 678 F. Supp. 2d at 156.  Plaintiffs allege no insider trading or regulatory requirement.

[22] On March 12, 2008, Mr. Herron explained that he did not foresee any issues relating to VeraSun's ability to perform the covenants on its project debt for plants acquired from U.S. BioEnergy.  Compl. ¶ 84.  Plaintiffs do not explain why they interpret this as a broad statement about working capital, and they do not even allege that the prediction was false—VeraSun is not alleged to have breached those covenants at any point short of its bankruptcy in late October, a month and a half after the close of the Class Period.

not obligated to characterize" it as problematic, "desperate,' 'dire' or otherwise." *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 702 (S.D.N.Y. 2000).  The Second Circuit "has repeatedly held that a company need not ... take an overly pessimistic view of its business." *In re Corning Inc. Sec. Litig.*, No. 04-2845-CV, 2005 WL 714352, at *1 (2d Cir. Mar. 30, 2005) (summary order) (citing cases).  Moreover, VeraSun's statements of past results did not create a duty to predict a less rosy future.  "'[D]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.'" *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) (citation omitted).

> 2.     No Duty to Make Interim Disclosure of Third-Quarter Losses

As to VeraSun's financial condition in the third quarter, Plaintiffs complain that although Defendants disclosed VeraSun's anticipated losses on September 16, they "inexplicably failed to disclose" those losses a few weeks earlier.  Compl. ¶ 94.  But even had they known of such losses in August, Defendants had no duty to disclose VeraSun's financial performance in the middle of a quarter,[23] because "there is no obligation to preannounce results," *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) (citing cases).  In *Northern Telecom*, this court dismissed claims that a company's failure to disclose "weaknesses in its principal product line" was fraudulent, because the company had reported the resulting losses in its eventual quarterly report and was "not required to make ... these disclosures earlier ...."  116 F. Supp. 2d at 458-59.[24]

---

[23] There can be no dispute that the losses in question arose entirely in the third quarter.  Plaintiffs do not suggest that the corn price even began to drop until late July and early August (Compl. ¶ 67), well after the end of the second quarter on June 30.

[24] Besides, as discussed below (*infra* Part II), it could not have been misleading, in mid-August, not to disclose that VeraSun would lose a substantial amount of money during the quarter ending on September 30.  The market conditions that caused the loss did not exist yet.  Among other reasons, there was no expected loss to report until Defendants knew the course of ethanol prices (*infra* at 22), a critical factor (Compl. ¶¶ 58-59) about which Plaintiffs make no allegations at all.

As in *Northern Telecom*, "Plaintiffs attempt to solve this problem by tying the disclosure to statements that were actually made" during the quarter, 116 F. Supp. 2d at 459, particularly the second-quarter earnings call during which Defendants allegedly offered projections about VeraSun's corn costs (Compl. ¶¶ 97-98).[25]  But *In re Duane Reade Inc. Securities Litigation* specifically rejected such an effort.  No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)*, aff'd*, 107 Fed. App'x 250 (2d Cir. 2004).  There, just as here, the defendants had presented the company's first-quarter results on an earnings call during the second quarter, during which they had made optimistic predictions about future results.  *Id.* at *1-2.  When the company eventually released its second-quarter results, it disclosed an 11.1% decrease in sales.  *Id*. at *3.  The court dismissed claims based on the failure to disclose sales problems on the conference call, because "there is no obligation to release interim sales data prior to a quarter's end," *notwithstanding the positive forecasts the defendants had made during the conference call*.  *Id*. at *5 (noting defendants' projections of "sales of approximately $355 million").

## II.     Plaintiffs Fail to Support the Necessary Inference of *Scienter*

The Complaint fails for the independent reason that Plaintiffs have not alleged facts suggesting that Defendants had the requisite *scienter*, which is at least "conscious recklessness— i.e., a state of mind *approximating actual intent*," *S. Cherry St.*, 573 F.3d at 109.[26]  Plaintiffs must allege facts showing "conduct that … represents an extreme departure from the standards of

---

[25] Plaintiffs also complain that Defendants "downplayed" corn costs, but the only example they can cite is Mr. Endres's opinion that ethanol prices were the main cause of tightening spreads. Compl. ¶ 97.  Not only is such opinion "not considered material for purposes of the securities laws," *Duane Reade*, 2003 WL 22801416, at *4 (citation omitted), Plaintiffs do not even suggest that Mr. Endres was incorrect.  Indeed, when VeraSun announced its expected loss on September 16, it explained that falling ethanol prices were a major cause.  Sept. 16 Release.

[26] For the forward-looking statements, no liability could possibly attach, even if there were no cautionary language, unless Plaintiffs sufficiently allege Defendants' actual knowledge. *GeoPharma*, 399 F. Supp. 2d at 448; 15 U.S.C. § 78u-5(c).  Having failed to support an inference of recklessness, *a fortiori* they have not alleged actual knowledge.  399 F. Supp. 2d at 448 n.122.

ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (emphasis omitted).  In addition, under the PSLRA, the Complaint must be dismissed unless the inference of *scienter* is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  The Court "must engage in a comparative evaluation" considering "other, nonculpable explanations for the defendant's conduct." *Id.*

Plaintiffs fail to support an inference that Defendants "must have been aware," 573 F.3d at 109, that their public statements were misleading.  They rely on innuendo, hints from unreliable confidential witnesses, and broad allegations that Defendants received regular reports on VeraSun's finances.  Such thin allegations are insufficient.

*First*, Plaintiffs allege no facts at all purporting to show that a crisis existed in March 2008.  Regardless of what they have alleged otherwise, they cannot support an inference of *scienter* about Defendants' statements at the time, such as the March 12 conference call.  Compl. ¶¶ 83-86.

*Second*, Plaintiffs make no suggestion that any Defendant had any motive to commit fraud.  There are no allegations that Defendants sold shares or engaged in other transactions during the Class Period or had any other way to benefit personally from the supposed fraud.[27]  In the absence of any motive, the "strength" of Plaintiffs' allegations of recklessness "must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

---

[27] For that matter, the allegations do not even suggest that VeraSun itself derived any benefit from the alleged fraud; its August 13 Form S-3 did not offer to sell any shares (Form S-3, at 4)— not that a corporate benefit from such a sale could supply a motive for these individual defendants anyway, *see Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (plaintiffs must show "concrete and personal" benefit).

**Third**, not only did Defendants not have any motive, they conducted themselves in a manner inconsistent with any intent to defraud: they reported VeraSun's finances accurately all along and announced VeraSun's expected third-quarter losses on September 16, well before the end of the quarter.  "[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file ... financial statements." *Rombach*, 355 F.3d at 176-77.  Plaintiffs suggest it is suspicious that Defendants did not disclose these losses one month earlier (Compl. ¶ 81), but "'allegations that statements in one report should have been made in earlier reports'" do not support an inference of *scienter*.  *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, No. 08-8143, 2010 WL 961596, at *12 (S.D.N.Y. Mar. 17, 2010) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)).  "If all that is involved is a dispute about the timing of the writeoff ... we do not have fraud; we may not even have negligence."  *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).  Plaintiffs offer no explanation for why Defendants, ostensibly knowing of VeraSun's expected losses, would have concealed those losses in August and then, for no apparent reason, disclosed them one month later.

**Fourth**, Plaintiffs provide no facts to suggest that Defendants actually did know in August about the expected losses they disclosed in September.  Plaintiffs rest their theory on the bare allegation that "it was revealed at the beginning of August" that the corn harvest "would be the second largest in history" (Compl. ¶ 98), but this conclusory allegation is manifestly insufficient.  "[K]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud," *Plumbers & Steamfitters*, 2010 WL 961596, at *10.

More fundamentally, there is no way, in logic or on these allegations, that Defendants could have known VeraSun's expected losses by mid-August with any confidence.  As Plaintiffs

themselves have made clear, and as VeraSun repeatedly disclosed, VeraSun's operating margins depended on the difference between the prices of ethanol and corn.  Compl. ¶ 58; 2007 10-K, at 50-51.  Indeed, the September 16 Release explained that VeraSun was suffering from a low ethanol price and a high corn cost.  Ex. 8.  Yet Plaintiffs provide no information at all about one half of that equation—the price of ethanol leading up to the August 12 conference call.  Leaving that aside, even if the cost of corn were all that mattered, the "second largest" corn harvest in history did not necessarily dictate prices, because price is a function of both supply and demand; indeed, the 2008 harvest was smaller than the *largest* harvest, in 2007,[28] a year when corn prices *increased* by 47%.  A few-week decrease in corn prices (Compl. ¶ 66) was hardly predestined, as of mid-August, to be permanent; the price could easily have rebounded.  Defendants "could not have been expected to anticipate" market conditions "with the accuracy Plaintiff enjoys in hindsight," *Plumbers & Steamfitters*, 2010 WL 961596, at *11.  Without such prescience, Defendants had no way to know what average cost of corn would result from the weekly accumulation of purchase obligations under the accumulator contracts (Compl. ¶¶ 66-67, 99).  Tellingly, Plaintiffs do not offer a single witness statement or document suggesting that any Defendant knew VeraSun would incur losses before it actually disclosed them.

In short, the inference is far more "cogent and … compelling," *Tellabs*, 551 U.S. at 314, that Defendants did not know, in August, which direction the market would go, and released information about VeraSun's losses when they became aware, based on another month of data, that such losses were probable.

***Fifth***, Plaintiffs cannot establish a strong inference of *scienter* as to their liquidity allegations from the alleged facts that Mr. Meier received spreadsheets "regarding reconciliations

---

[28] *See* U.S. Dep't of Agriculture, News Release, *USDA Forecasts Robust Corn and Soybean Crops, Despite Flooding* (Aug. 12, 2008) (Ex. 12).

and margin calls" (Compl. ¶ 77); that a "risk management committee" discussed the spreadsheets (*id*. ¶ 78); that Mr. Endres also received "reports" on VeraSun's trading (*id*. ¶ 80); and that Mr. Endres did "a lot of research" about risk management (*id*. ¶ 79). Plaintiffs do not say what information was in any of these reports, and, without any description of their contents, such allegations are insufficient to plead *scienter*. "Second Circuit cases uniformly rely on allegations that ... *specific* contradictory information was available to the defendants." *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group Ltd.*, 2009 WL 4893719 (2d Cir. Dec. 21, 2009); *In re MBIA, Inc., Sec. Litig.*, No. 08-264, 2010 WL 1253925, at *17 (S.D.N.Y. Mar. 31, 2010) (dismissing for lack of *scienter*; defendants' receiving reports not enough, without allegations about what reports said).

Besides, whatever else Defendants knew, they must also have known what they disclosed: that VeraSun had $85 million available on its credit line at the end of June (Compl. ¶ 49), as well as $28 million in cash and $167 million in accounts receivable (Q2 10-Q). These facts undermine the notion that Defendants were concealing a "catastrophic liquidity crisis." To be sure, a crisis came eventually, but that does not mean it existed earlier, much less that Defendants intentionally concealed it.

**Sixth**, Plaintiffs' attempt to gather, and extrapolate from, snippets gleaned from confidential witnesses must fail, in part because many of those witnesses lacked the requisite knowledge. Under the PSLRA, allegations that depend on confidential witnesses must demonstrate the "probability that a person in the position occupied by the[] source[] would possess the information alleged." *Novak*, 216 F.3d at 314.

• Plaintiffs cannot support their (irrelevant) allegations that VeraSun changed its accounting practices to collect cash from its plants (Compl. ¶¶ 44, 56-57), because the witnesses on whom

they base this allegation (CW 5, CW 7) worked at U.S. BioEnergy, an independent company that first began to integrate with VeraSun after the March 31 merger.  Such witnesses cannot be expected to have known about VeraSun's previous accounting practices.  And even if VeraSun changed accounting practices and collected cash from plants, that hardly shows a "crisis."[29]

• Plaintiffs cannot support their allegation that VeraSun hired a bankruptcy consultant in May 2008 (Compl. ¶ 42), because their source (CW 1) acknowledges that he or she had no knowledge that this consultant performed any role related to bankruptcy until October (*id.*).  AlixPartners provides services besides "bankruptcy/restructuring": it advises companies on conserving cash so as to thrive in tough economic climates (*supra* at 4).  Indeed, all the witness observed is that AlixPartners "assist[ed] with cash flow projections and management."  Compl. ¶ 42.

    ***Seventh***, the opinions of various witnesses and their reports of the opinions of various (and sometimes inconsistent[30]) company officials, other than Defendants (*id.* ¶¶ 46, 50, 54, 63, 65, 68-72), are simply irrelevant.[31]  Plaintiffs "must allege facts sufficiently demonstrating *each* defendant's state of mind regarding his or her alleged violations," *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004) (emphasis added) (interpreting 15 U.S.C. § 78u-4(b)(2)), and allegations about what *other* officials thought will not serve.  "At best, [these] allegations establish[]  that such an opinion was held by the [speaker] and his peers.  [They] shed[] no light

---

[29] CW 8 also complains that at the end of August, VeraSun redirected the "sales net-backs" that had gone through "Provista."  *Id.* ¶ 57.  Provista was U.S. BioEnergy's ethanol marketer, but VeraSun performed that task in-house.  CW 8 appears to be unaware that VeraSun had publicly announced its plan to terminate Provista's contract during the third quarter.  Q2 10-Q, at 9.

[30] For example, CW 4 believes VeraSun did not hedge the accumulator contracts because it did not have any cash, while CW 12 told Plaintiffs that accumulators cannot be hedged.  *Compare* Compl. ¶ 69 *with id.* ¶ 70.

[31] The opinions are also unfounded.  For example, Plaintiffs allege that VeraSun halted its construction of three refineries in June 2008 because "get[ting] the plants up and running" required too much cash—but Plaintiffs rest this allegation on information from CW 10, who was only involved in refinery construction until March 2008.  Compl. ¶ 54.

on the relevant issue of whether the [i]ndividual Defendants shared this view[.]" *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1086 (8th Cir. 2005).

In short, Plaintiffs do not provide facts that suggest at all, much less compellingly, that Defendants had any intent to commit fraud. To the contrary, Defendants strove to maintain and expand VeraSun through a summer of increasingly poor market conditions. They made careful efforts to conserve VeraSun's cash, as good executives should, and they reported faithfully and accurately on the quarterly financial condition of the Company. Throughout 2008, as the corn-ethanol spread continually narrowed, Defendants alerted the market to the potential impact of that development on VeraSun. Then, far from concealing VeraSun's third-quarter losses, Defendants disclosed those losses as soon as they felt reasonably confident of at least part of the amount. All of these inferences are consistent with the allegations of the Complaint. The contrary inference of fraudulent intent does not make sense, especially when Defendants had nothing to gain from the alleged fraud.

## III.    Plaintiffs' Section 20(a) Claim Must Also Be Dismissed

Because Plaintiffs fail to plead the fraud that they claim as the primary violation, their Section 20(a) claim must be dismissed.

## CONCLUSION

For all the above reasons, Defendants respectfully move this Court to dismiss Plaintiffs' Consolidated Class Action Complaint.

Respectfully Submitted,

Dated:  New York, New York
        April 29, 2010

WILMER CUTLER PICKERING
HALE AND DORR LLP

By: /s/ Michael G. Bongiorno
    Michael G. Bongiorno
    Keith Bradley
    399 Park Avenue
    New York, New York 10022
    Tel.: 212-230-8800
    Fax: 212-230-8888

*Attorneys for Defendants Donald L.
Endres, Bryan D. Meier, and Danny
C. Herron*