**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------  :
                                                          :
YARON GISSIN, Individually and on                         :
Behalf of All Those Similarly Situated,                   :
                    Plaintiff,                            :
        vs.                                               :
                                                          :   Civil Action No. 1:09-cv-09338-SAS
DONALD L. ENDRES, DANNY C.                                :
HERRON AND BRYAN D. MEIER,                                :
                    Defendants.                           :
                                                          :
                                                          :
                                                          :
                                                          :
                                                          :
                                                          :
--------------------------------------------------------  :


**LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ............................................................................................................ 1

II.   SUMMARY OF RELEVANT FACTS ........................................................................... 3

III.   STANDARDS ON A MOTION TO DISMISS ............................................................... 6

IV.   ARGUMENT ..................................................................................................................... 7

   A.   The Complaint Adequately Alleges False and Misleading Statements ............................... 7

      1.   Defendants' False and Misleading Statements Are Not "Forward-Looking" ................. 8

      2.   Defendants' Boilerplate Cautionary Language
         Does Not Shield Them from Liability ........................................................................ 11

      3.   Defendants' False and Misleading Statements Are Not Puffery .................................... 13

      4.   Defendants Had a Duty To Disclose the Liquidity Crisis .............................................. 14

   B.   The Complaint Supports a Strong Inference of Scienter .................................................. 16

      1.   Defendants Knew or Were Reckless in Not Knowing Their Statements
         Were False And Misleading ..................................................................................... 16

      2.   Defendants Had Motive and Opportunity to Commit Fraud ......................................... 21

   C.   Allegations Based on Information from Confidential Witnesses Bolster
      the Inference of Scienter ................................................................................................ 22

V.   CONCLUSION ................................................................................................................ 24

## TABLE OF AUTHORITIES

CASES                                                                PAGE(S)

*Abbey v. 3F Therapeutics, Inc.*,
    No. 06-409, 2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009) ........................................14

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................................7

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)....................................................................14, 22

*In re Brittania Bulk Holdings Inc. Sec. Litig.*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2006).............................................................................8

*In re Centerline Holdings Co. Sec. Litig.*,
    613 F. Supp. 2d 394 (S.D.N.Y. 2009)...........................................................................15

*In re Cerner Corp. Sec. Litig.*,
    425 F.3d 1079 (8th Cir. 2005) .......................................................................................24

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
    No. 08-3612, 2010 WL 1172647 (S.D.N.Y. Mar. 26, 2010)..................................16

*Danis v. USN Commc'ns, Inc.*,
    73 F. Supp. 2d 923 (N.D. Ill. 1999) ..............................................................................19

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02-6478, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)..................................15

*Ellenburg v. JA Solar Holdings Co. Ltd.*,
    No. 08-10475, 2010 WL 1983375 (S.D.N.Y. May 17, 2010) .......................8, 14, 17

*Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) .......................................................................................21

*Freudenberg v. E*Trade Fin. Corp.*,
    No. 08-8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010) ................17, 19, 22, 23

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)....................................................................................14, 24

*In re Globalstar Sec. Litig.*,
    No. 01-1748, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003).................................12

i

*Hall v. The Children's Place Retail Stores, Inc.*,
　580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................................................9, 16, 19, 24

*In re Ibis Tech. Sec. Litig.*,
　422 F. Supp. 2d 294 (D. Mass. 2006) ......................................................................................22

*In re IBM Corporate Sec. Litig.*,
　163 F.3d 102 (2d Cir. 1998) ......................................................................................................13

*In re Initial Pub. Offering Sec. Litig.*,
　241 F. Supp. 2d 281 (S.D.N.Y. 2003) .......................................................................................8

*Katz v. Image Innovations Holdings, Inc.*,
　542 F. Supp. 2d 269 (S.D.N.Y. 2008) .....................................................................................20

*Lapin v. Goldman Sachs Group, Inc.*,
　506 F. Supp. 2d 221 (S.D.N.Y. 2006) .....................................................................................14

*In re MBIA, Inc. Sec. Litig.*,
　No. 08-264, 2010 WL 1253925 (S.D.N.Y. Mar. 31, 2010) ....................................................18

*In re N. Telecom Ltd. Sec. Litig.*,
　116 F. Supp. 2d 446, (S.D.N.Y. 2000) .....................................................................................15

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
*Am. West Holding Corp.*,
　320 F.3d 920 (9th Cir. 2003) .....................................................................................................19

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000) ........................................................................................................7

*In re Oxford Health Plans*,
　187 F.R.D. 133 (S.D.N.Y. 1999) .........................................................................................9, 13

*Phillips v. Scientific-Atlanta, Inc.*,
　374 F.3d 1015 (11th Cir. 2004) ................................................................................................24

*Plumbers & Steamfitters Local 773 Pension Fund v.*
*Canadian Imperial Bank of Commerce*,
　No. 08-8143, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ....................................................20

*In re Prudential Sec. Ltd. P'shps. Litig.*,
　930 F. Supp. 68 (S.D.N.Y. 1996) .............................................................................................11

*In re PXRE Group, Ltd., Sec. Litig.*,
　600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group Ltd.,*
　357 Fed. Appx. 393 (2d Cir. 2009) ...........................................................................................18

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................................22

*S. Cherry St., LLC v. Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009)........................................................................7, 16

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009)..................................................7, 16, 17, 18

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..........................................................................20

*Schottenfeld Qualified Assoc. v. Workstream, Inc.*,
  No. 05-7092, 2006 WL 4472318 (S.D.N.Y. May 4, 2006) ....................................11

*In re Scottish Re Group Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................24

*In re Stone & Webster, Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005)..................................................................9, 10, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................7, 16, 24

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)..................................................................................14

*In re Twinlab Corp. Sec. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y. 2000) ..............................................................21

*In re Tyco Int'l., Ltd.*,
  MDL No. 02-1335-B, 2007 WL 1703023 (D.N.H. June 11, 2007).........................11

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)........................................................... *passim*

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003)............................................................20

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................................................12

## STATUTES

15 U.S.C. § 78u-5 ................................................................................................8

15 U.S.C. § 78u-5(i)(1)..................................................................................9, 10

15 U.S.C. § 78u-5(c)(1) ......................................................................................9

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5.................................................................................................................14

Lead Plaintiffs Wayne Mitchell and Son Nguyen ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint").[1]

## I.    INTRODUCTION

This securities fraud class action stems from the stunning collapse of one of the ethanol industry's largest and fastest growing companies.[2]   Throughout the period of March 12, 2008 through September 16, 2008 (the "Class Period"), Defendants kept investors in the dark about critical information regarding the Company's massive liquidity problems and falsely represented that VeraSun Energy Corporation ("VeraSun" or the "Company") had sufficient cash to meet its needs.[3]   By October 2008, the Company had declared bankruptcy due to liquidity issues. ¶ 106.

Prior to its collapse, VeraSun spent massive amounts of money to construct a number of ethanol refineries and took on significant debt to help finance its aggressive expansion.   In the summer of 2008, the Company's predicament worsened when VeraSun entered into highly risky accumulator contracts to counteract corn prices that had spiked due to weather conditions.  *See* ¶¶ 65-66.   When the price of corn began to drop in late July 2008, these contracts locked the Company into buying twice as much corn as it needed at above-market prices. Although Defendants knew by late July 2008 that these accumulator contracts had significantly worsened the Company's cash crisis, they continued to tout VeraSun's purported sound liquidity and

---

[1] All "¶" references are to the Complaint, unless otherwise noted.

[2] Ethanol is an alcohol that is used in gasoline to increase octane and reduce emissions.  ¶ 31. Corn is its primary ingredient.  *Id.*

[3] The Defendants are Donald L. Endres ("Endres") who was Chairman of the Board, a Director and Chief Executive Officer, Danny C. Herron ("Herron") who was a Senior Vice President and Chief Financial Officer, and Bryan D. Meier ("Meier") who was Vice President, Finance and Chief Accounting Officer.  ¶¶ 20-22.

ability to continue as a going concern.  Indeed, Defendants make no credible argument to explain how they went from reassuring investors of VeraSun's liquidity in mid-August 2008 to filing for bankruptcy just over **two months later**.

In attempting to challenge the Complaint, Defendants ignore or mischaracterize Plaintiffs' allegations and ask the Court to draw unwarranted inferences in their favor.  Their arguments are without merit and are contrary to the facts properly alleged in the Complaint.  First, Defendants argue that the statements set forth in the Complaint were "forward-looking" or inactionable puffery.  They are wrong.   During the Class Period, Defendants repeatedly reassured investors that the Company had the liquidity to support its rapid expansion.  *See*, *e.g.*, ¶¶ 48, 88, 92, 95.   The Complaint alleges Defendants knew these statements, as well as numerous other specific factual averments relating to its cash position, were false when made.  *See* § IV.A., *infra*.

Second, Defendants argue that the Complaint fails to adequately allege scienter, claiming that none of the Defendants could have foreseen the losses they announced in September.  Defendants' feigned ignorance of the liquidity problems is not credible and is contrary to the allegations in the Complaint.   The allegations support the inference that Defendants acted intentionally to conceal VeraSun's grave liquidity problems that worsened throughout the Class Period.   The Complaint's allegations are supported by information from numerous former VeraSun employees who observed that during the Class Period the Company was engaging in extreme measures to generate cash to forestall a burgeoning liquidity crisis.   These allegations reveal a significant disconnect between what Defendants knew and Defendants' contemporaneous public statements.  *See* § IV.B., *infra*.

In sum, the Complaint makes clear that VeraSun was not "felled by extremely difficult

market conditions [] that it did not forsee." Def. Br. at 2.[4]   Rather, Defendants attempted to disguise VeraSun's liquidity crisis as long as possible by assuring investors that the Company was in a position to fund its operations and continue its aggressive expansion.   When the Company's $750 million offering announced on August 14, 2008 fell through and the Company was unable to secure any financing to stave off insolvency, Defendants were forced to come clean.   The Complaint properly alleges that Defendants were aware that the Company was experiencing a liquidity crisis of epic proportions and they hid these facts from investors. Accordingly, Defendants' motion should be denied in its entirety.

## II.   SUMMARY OF RELEVANT FACTS

At the beginning of 2008, VeraSun was one of the largest and fastest growing ethanol producers in the United States.  ¶¶ 2, 33, 35.  The tale of VeraSun's demise begins in March of 2008, just prior to VeraSun's acquisition of US BioEnergy, through which VeraSun added three ethanol refineries that were under construction to the four it already had in the build out stage. ¶¶ 3, 35-36.[5]   Thus, VeraSun had seven facilities under simultaneous construction.   ¶ 39.   The tremendous amount of cash being used to build these new facilities quickly put the Company in a precarious liquidity position. ¶¶ 4, 40-41, 54.[6]   In addition to the cash expended, the Company also took on over $97 million in debt to finance its rapid expansion, resulting in a staggering net decrease in cash of over $179 million for the first half of 2008.  ¶ 40.

While VeraSun's liquidity problems were mounting, in March and April 2008, Defendants falsely assured investors that the Company's liquidity was strong.   ¶¶ 83-86.

---

[4] References to "Def. Br. at __" are to Defendants' Memorandum in Support of their Motion to Dismiss the Complaint, filed April 29, 2010. [Dkt. No. 31].

[5] The US BioEnergy merger was completed on April 1, 2008.  ¶ 36.

[6] For instance, the Company spent over $188 million on purchases of property and equipment during the first six months of 2008.  ¶ 40.

However, the Company's liquidity woes were readily apparent to Defendants as evidenced by their retention of bankruptcy consultants during the Class Period to help with cash flow. ¶¶ 42, 80. According to numerous confidential witnesses ("CWs"), Defendants also engaged in a number of practices to shift cash away from the local plants and onto the corporate balance sheet to make the Company's liquidity appear robust. ¶¶ 42, 45.

In May 2008, to hide the growing problems from investors, the Company secured a $125 million credit facility just before announcing its first quarter 2008 results. ¶¶ 47-48. Days later, on a May 13, 2008 conference call with analysts, Defendants assured investors that the Company had the "*liquidity flexibility to run [] and grow our business*" and that the credit facility was a "liquidity insurance policy" that would help fund the Company's rapid expansion.[7] ¶ 48. Unbeknownst to investors, however, the $125 million credit facility was not an insurance policy for potential liquidity problems; rather, it was a lifeline to staunch the bleeding of cash caused by the Company's massive construction costs. ¶ 49. By late June 2008, the cash crisis was so severe that Defendants halted construction of three refineries to conserve cash. ¶ 53. Instead of disclosing that the Company was experiencing cash flow issues, Defendants blamed the construction halt solely on "market conditions." ¶¶ 53-54.

The magnitude of VeraSun's undisclosed liquidity problems forced the Company to engage in risky and speculative financial transactions in a futile effort to save itself. Specifically, in early June 2008, the price of corn skyrocketed to nearly $8.00/bushel due to supply concerns triggered by poor weather conditions in the Midwest. ¶¶ 62. Because VeraSun's gross margin largely depends on the "crush spread" (the difference between corn and ethanol prices), the high price of corn had a huge impact on VeraSun's already-strained financial condition. ¶¶ 58-59.

---

[7] Unless otherwise noted, all emphasis is added and internal quotations and citations are omitted.

Based on the assumption that corn prices would continue to increase, VeraSun exited its short financial position in corn and entered into highly risky "accumulator contracts." ¶¶ 63-64. An accumulator contract obliges investors to purchase a security, currency or commodity at a fixed price – often set at a discount to prevailing market rates – at regular intervals. If the market price rose above the fixed purchase price, VeraSun would have made money. Conversely, if the market price dropped below the fixed price, the Company was required to buy twice as much corn at above-market prices. ¶¶ 65-66. If these accumulator contracts worked as hoped and corn prices continued to rise, VeraSun would generate a cash windfall which would help offset the Company's cash flow problems.

However, in mid-July 2008, corn prices reversed course and fell from almost $8.00/bushel to nearly $5.00/bushel. ¶ 67. Under the terms of the accumulator contracts, the Company was now required to buy twice as much corn at above-market prices, paying nearly $6.50-$7.00/bushel. ¶¶ 64, 66-67.[8] Combined with the existing cash problems created by its aggressive refinery construction, the hedging failures put the Company at the brink of bankruptcy. ¶¶ 67, 98.[9]

Yet despite the obvious crisis the Company was facing, in early August 2008, Defendants brazenly continued to advise the public that VeraSun's liquidity was sound and that it was sufficiently funded for at least the next 12 months. ¶¶ 92-99. For instance, on August 12, 2008,

---

[8] Defendants incorrectly assert that "the price of corn **had only begun to drop** [in mid-August] after a period of significant increases . . . ." Def. Br. at 1. In fact, corn prices rose in June and early July 2008 but dropped significantly by mid-July. ¶¶ 62, 67.

[9] The Company's severe liquidity problems are corroborated by numerous CWs throughout the Complaint. *See* ¶¶ 42-46, 50-52, 54-55, 57, 63, 65, 68-72, 74, 76-80.

after announcing consensus-beating second quarter 2008 results,[10] when asked by an analyst about the Company's liquidity, defendant Herron claimed that "***based on our current view and what we know, yes, we think we'll be just fine*** [in terms of liquidity]." ¶¶ 95, 97. Just two days later, on August 14, 2008, in a desperate attempt to raise cash to cover the massive losses from its hedging failures, Defendants registered a $750 million offering. ¶¶ 73, 100. However, Defendants could not consummate the offering in time to save the Company. ¶¶ 100-101.

On September 16, 2008, just one month after Defendants had announced expectations-beating earnings and assured investors its liquidity was "***just fine***," (¶ 95) VeraSun finally admitted that it was suffering a cash shortage and expected to take estimated losses of up to $103 million. ¶¶ 81, 95, 103. Only later did VeraSun confirm its actual losses of $476 million – more than four and a half times the Company's September 16 estimate.[11] ¶ 109. As a result of these disclosures, the Company's stock price plunged 70%, closing at $1.41 per share. Just six weeks later, on October 31, 2008, VeraSun filed for Chapter 11 bankruptcy protection and subsequently acknowledged that the "***negative stories out there about our liquidity situation . . . were true***[.]" ¶¶ 82, 107.

## III.   STANDARDS ON A MOTION TO DISMISS

To state a claim for relief under §10(b) of the Securities Exchange Act of 1934, a plaintiff must allege that defendants: "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff

---

[10] Thoroughly beating analysts' expectations, VeraSun reported record revenues of over one billion dollars and significant earnings in 2Q08. *See* Declaration of Michael G. Bongiorno in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Bongiorno Decl.") Ex. 5 at 12.

[11] This loss included $119 million attributed specifically to corn-related derivative losses arising mainly from the accumulator contracts. ¶ 109.

relied, and (5) that the plaintiffs reliance was the proximate cause of its injury." *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 526 (S.D.N.Y. 2009) (Scheindlin, J.).  A complaint is adequate if the plaintiff has pled "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In assessing scienter allegations, the Court must consider whether "all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007); *see also S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 111 (2d Cir. 2009).  Viewed holistically, a complaint sufficiently alleges scienter if the allegations are "cogent" and "at least as compelling" as any opposing inferences.  *Tellabs*, 551 U.S. at 314.

## IV.    ARGUMENT

### A.    The Complaint Adequately Alleges False and Misleading Statements

The Complaint specifically identifies the Class Period statements that are alleged to be false and misleading and/or omitted material information (¶¶ 83-85, 87-88, 90, 92-93, 95-97, 100), when and where these statements were issued (*id*.), who made the statements (*id*.) and why the statements are false and/or omitted material information (¶¶ 86, 89, 91, 94, 98-99, 101-112). The Complaint also sets forth the reasons Defendants' statements were false and misleading based on, among other facts, the accounts of CWs with firsthand knowledge about the matters to which they were speaking (¶¶ 42-46, 50-52, 54-55, 57, 63, 65, 69, 70-72, 74, 76-80), VeraSun's bankruptcy filings (¶¶ 106-107, 111-112), and post-Class Period SEC filings (¶¶ 108-110).  This satisfies the particularity requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

Rather than pointing to any pleading defects, Defendants challenge the Complaint's

allegations on the merits and improperly ask the Court to weigh evidence.  *See e.g.*, Def. Br. at 18 ("the market conditions that caused the loss did not exist [in mid-August]"); *Id*. at 1 ("the price of corn had only just begun to drop [in mid-August 2008]"); *Id*. at 2 ("VeraSun was felled by extremely difficult market conditions, including the credit crisis, that it did not forsee."). Substantive challenges to the merits of Plaintiffs' claims, however, are not appropriate at this stage.  *Ellenburg v. JA Solar Holdings Co. Ltd.*, No. 08-10475, 2010 WL 1983375, at *1 (S.D.N.Y. May 17, 2010) ("The Court's function on a motion to dismiss is not to weigh the evidence . . . but merely to determine whether the complaint itself is legally sufficient.") (internal quotations omitted); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 295 (S.D.N.Y. 2003) (the court must "tak[e] the fact of the complaints as true . . . and draw[] every inference in plaintiffs' favor").  Thus, Defendants' self-serving version of the facts should be disregarded.[12]

### 1.    Defendants' False and Misleading Statements Are Not "Forward-Looking"

A defendant's "forward-looking" statements are entitled to safe harbor protection only if they: (1) address the future; and (2) are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those projected in the forward-looking statement. 15 U.S.C. § 78u-5.[13]  Omissions of *existing* facts or

---

[12] Defendants fundamentally mischaracterize the allegations and argue that VeraSun adequately disclosed the risks associated with its hedging practices, relying on *In re Brittania Bulk Holdings Inc. Securities Litigation*, 665 F. Supp. 2d 404, 415 (S.D.N.Y. 2009).  *See* Def. Br. at 9, 16.  But in contrast to *Brittania Bulk*, where plaintiffs' claims centered on defendants' failure to disclose the speculative nature of their hedging activity, here, Plaintiffs' claims are based on Defendants' misleading statements regarding VeraSun's liquidity.  While VeraSun's accumulator contracts worsened the liquidity crisis, nowhere do Plaintiffs assert claims based on the decision to enter into them or to whether or not they were disclosed.  Thus, *Brittania Bulk* is inapplicable.

[13] The PSLRA defines a "forward-looking" statement as including: "(A) a statement containing a projection of revenues, income . . . earnings (including earnings loss) per share, . . . capital expenditures, dividends, . . . or other financial items; (B) a statement of the plans and objectives

circumstances are not protected. *In re Oxford Health Plans*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999). Moreover, such a statement is not protected if it "was made with actual knowledge that it was false or misleading." 15 U.S.C. § 78u-5(c)(1); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (Scheindlin, J.) (safe harbor inapplicable where defendants had no basis for their optimistic statements and allegedly already knew that certain risks had become reality). Whether a forward-looking statement is actionable "depends on all relevant circumstances of the particular case . . . and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003).

Here, the statements alleged in the Complaint are not "forward-looking" because they address the ***prior*** and ***present*** status as well as future outlook for VeraSun's liquidity. The Company's disclosures, taken collectively and in context, were based on ***current*** solid fundamentals and strong ***existing*** liquidity. For instance, VeraSun and/or the Defendants made the following statements during the Class Period:

¶ 48: The Company currently has the "liquidity flexibility to continue to run our business and grow our business";

¶ 83: "[B]ased on our ***current*** expectation of cash flows from operations and the cash and cash equivalent short-term investments, and also our revolving credit facility, we feel we will be in a position to fund those capital investments for the year";

¶ 88: "We ***have a large investment in working capital*** and that investment will grow as we more than double our quarterly volumes through our VeraSun marketing team";

¶¶ 88, 90: Defendant Herron characterized the ***recently-secured*** facility as a "liquidity insurance policy" that "will provide additional liquidity sources to support our accelerated growth";

---

of management for future operations . . . ; (C) a statement of future economic performance . . . ; (D) any statement of the assumptions underlying or relating to [any of the above]." § 78u-5(i)(1); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005).

¶ 92: "[B]ased on ***current market conditions***, we believe that our ***existing sources of capital will be sufficient*** to fund anticipated working capital requirements, capital expenditures and cash required for other activities . . . "; and

¶ 95: When asked by an analyst if the Company had enough liquidity to finance the Company's existing operations, Defendant Herron stated "Yes . . . That would be our ***current view*** given market conditions . . . [B]ased on our ***current view and what we know***, yes, we think we'll be just fine."

Defendants' statements primarily concern the Company's ***current*** access to funds to meet its operating and capital expenditure needs.  The statements addressed VeraSun's liquidity and financial viability at the time the statements were made, not its projected revenues, income, earnings, management plans, or objectives for future operations, which the statute requires to invoke its shield to liability. 15 U.S.C. § 78u-5(i)(1).

Furthermore, mixed statements of present, past and future condition are not entitled to the protections of the safe harbor provision.  In *Stone & Webster*, a case strikingly similar to the case at bar, the plaintiffs alleged that defendants issued false and misleading statements regarding the company's liquidity and reassured investors that it had cash sufficient to meet its needs, even as the company spiraled into bankruptcy.  414 F.3d at 206.  In finding that defendants' statements were not protected by the safe harbor provision, the court recognized that:

Essentially[,] the statement asserts that the Company has ***present*** access to funds sufficient to meet anticipated ***future*** needs. The part of the statement that speaks of the quantity of cash on hand ***speaks of a present fact***. The part that speaks of the amount of "anticipated operating, dividend and capital expenditure needs" speaks of a projection of future economic performance. The claim of fraud, however, does not involve a contention that the defendants were underestimating the amount of their future cash needs. ***The claim is rather that the defendants were lying about the Company's present access to funds***. The Company was, according to the allegations of the Complaint, in an extreme liquidity crunch. . . The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.

*Id.* at 213.[14]  Similarly, in *Vivendi*, "the paragraphs cited include[d] Vivendi's announcements of . . . purported opinion as to its cash situation, which [is] not subject to the safe harbor provision." 381 F. Supp. 2d 158, 183.  The court held that "linking future success to present and past performance does not render statements immune from liability."  *Id*; *see also In re Tyco Int'l., Ltd*., MDL No. 02-1335-B, 2007 WL 1703023, at *9 (D.N.H. June 11, 2007) (statements that liquidity was sound were not "forward-looking" and thus not shielded by the safe harbor provision).

Here, Defendants' mixed statements regarding the Company's prior, present and future liquidity condition are not forward-looking.  Thus, they are not shielded by the safe harbor provision.

### 2.      Defendants' Boilerplate Cautionary Language Does Not Shield Them from Liability

Even if the statements at issue were deemed forward-looking – which they are not – Defendants' failure to provide ***meaningful*** cautionary language disclosing known risks about VeraSun's existing liquidity predicament prevents Defendants' reliance on this doctrine. Generic, boilerplate statements are insufficient and cautionary language must "precisely address" the substance of the specific statement that is at issue.  *In re Prudential Sec. Ltd. P'shps. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *Vivendi*, 381 F. Supp. 2d at 183; *Schottenfeld Qualified Assoc. v. Workstream*, *Inc*., No. 05-7092, 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006) (cautionary language that "refers to the most general of economic risks" is insufficient).

Defendants rely heavily on the disclosures in the Company's 2007 10-K, yet they identify

---

[14] The *Stone & Webster* court further noted that "where the falsehood relates to a representation of present fact in the statement, it will not necessarily come within the statute's safe harbor, even though the statement might also contain a projection of future financial experience."  *Id*.

only *two* vague and ineffective "warning" statements that were made after March 12, 2008.  Def. Br. at 8-9; 14-16.[15]  These generic warnings do not even come close to the "cautionary language [needed] to render reliance on the misrepresentation unreasonable."  *Vivendi*, 381 F. Supp. 2d at 183.  More importantly, Defendants cannot point to a single disclosure in 18 pages of cautionary language in VeraSun's 2007 10-K that *specifically* warns of VeraSun's liquidity problems.  Bongiorno Decl., Ex. 2 at 11-29.   The "risk factors" cited by Defendants are unspecific and uninformative.  They only caution that certain general risks could cause VeraSun's "business, financial condition or results of operations [to] be materially adversely affected . . . ."  Bongiorno Decl., Ex. 2.  These generic warnings fail to even marginally address the substance of the false and misleading statements alleged in the Complaint. [16]

Moreover, because Defendants knew their statements regarding VeraSun's strong liquidity were false (*see* § IV.B.1.), the cautionary language to which Defendants cite is ineffective.  *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 427 (S.D.N.Y. 2003) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")[17]  Defendants knew, at least by early

---

[15] *See* Bongiorno Decl., Ex. 2 at 24 (VeraSun's Form 10-K for the year ended 2007 filed with the SEC on March 12, 2008).  Defendants claim the "copious warning" statements include: (1) "*that always depends on . . . where the market ends up going . . .*"; and (2) "*cash flows from future operations and the amount and timing of our future financing needs are inherently uncertain.*"  Def. Br. at 15-16; Bongiorno Decl. Ex. 9 at 5, Ex. 5 at 15.

[16]  Defendants' argument regarding the Company's risk disclosures concerning the corn derivatives and accumulator contracts (Def. Br. at 9) is a red herring.  As discussed *supra* at note 12, Plaintiffs do *not* claim that Defendants failed to inform investors of its change in hedging strategy or the fact it entered into accumulator contracts. The false and misleading statements at issue in this case concern VeraSun's cash position and liquidity.

[17] *See also In re Globalstar Sec. Litig.*, No. 01-1748, 2003 WL 22953163, at *9 (S.D.N.Y. Dec. 15, 2003) (knowingly false statements not protected by "safe harbor" despite cautionary

August 2008, that liquidity concerns were crippling the Company, and that the large losses that began accruing in mid-July from the accumulator contracts were exacerbating the situation. Notwithstanding, Defendants said **nothing** about the liquidity concerns in the August 12, 2008 announcements, downplayed the high price of corn and assured the public that "***based on our current view and what we know, yes, we think we'll be just fine*** [in terms of liquidity]." ¶¶ 95, 97.

### 3.   Defendants' False and Misleading Statements Are Not Puffery

Defendants' "puffery" argument is also without merit.  Def. Br. at 12 n.12.  First, "[w]hether the opinion or soft information is indeed actionable depends on all relevant circumstances of the particular case, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action."  *Vivendi*, 381 F. Supp. 2d at 182.  Second, Defendants' statements were not merely statements of optimism, but rather were "conclusory terms [used] in a commercial context [that] [may be] reasonably understood to rest on a factual basis that justifies them as accurate . . . ."  *Id.*  For example, Defendants confidently stated: "[t]he company continues to maintain a strong balance sheet" (¶ 83); "we feel we will be in a position to fund those capital investments for the year" (*id.*); we have the "liquidity flexibility to continue to run our business and grow our business" (¶ 88); and "we believe that our existing sources of capital will be sufficient to fund anticipated working capital requirements, capital expenditures and cash required for other activities for at least the next 12 months." ¶ 92.  These statements do not reflect opinion or belief – they are actionable as factual representations.  *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); *Oxford Health Plans*, 187 F.R.D. at 141 ("It is disingenuous to suggest that factual assertions are puffery and opinion that no reasonable

statements).

investor could rely on for their truth simply because [the company] claims only to have stated that it believes in their truth.").  Finally, even if categorized as optimistic statements – which they are not – the statements are actionable because they "are supported by specific statements of fact, [and it has been alleged that] the speaker does not genuinely or reasonably believe them." *Abbey v. 3F Therapeutics, Inc.*, No. 06-409, 2009 WL 4333819, at *9 (S.D.N.Y. Dec. 2, 2009).

### 4.    Defendants Had a Duty To Disclose the Liquidity Crisis

Once Defendants elected to speak on the Company's cash position and ability to finance its expansion and future operations, they were obligated to "be truthful, accurate, and complete." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159-160 (S.D.N.Y. 2008).[18]  By affirmatively discussing – and emphasizing – VeraSun's ability to meet its cash needs (¶¶ 83-85, 88, 90, 92, 95), Defendants unquestionably had a duty to fully disclose the pressing liquidity issues.  17 C.F.R. § 240.10b-5; *Bristol Myers*, 586 F. Supp. 2d at 159-60.[19]  They did not do so. For instance:

- Defendants failed to disclose that the Company was experiencing significant liquidity problems in growing the Company at an extraordinary rate through expansion of its refineries throughout the Midwest on the March 12, 2008 and the May 13, 2008 conference calls. ¶¶ 86, 89.

---

[18] *See also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("[T]he lack of an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak one has a duty to be both accurate and complete."); *Ellenburg*, 2010 WL 1983375, at *3 ("Even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, one has a duty to be both accurate and complete.").

[19] Information is considered material if there is "a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). VeraSun's liquidity problems were certainly material information. Because materiality is a mixed question of law and fact, courts typically do not dismiss a securities fraud complaint at the pleading stage unless reasonable minds could not differ on the importance of the omission.  *See, e.g., TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

- Defendants failed to disclose that, notwithstanding the new credit facility, the Company's liquidity was so impaired from the rapid expansion of refineries, the $125 million revolving credit facility was necessary to keep the Company afloat rather than serving as an insurance policy for a potential liquidity crisis in the June 2, 2008 press release. ¶ 91.

- Defendants failed to disclose the severity of the impact of the accumulator contracts that locked the Company into future corn purchases at prices above the then-current market price on the August 12, 2008 conference call announcing the 2Q08 results. ¶¶ 95, 98.

- Defendants failed to disclose that the true reason they halted construction on three ethanol refineries was because the Company was short on cash, instead blaming the construction delay on "current market conditions" in the June 25, 2008 8-K and the August 12, 2008 conference call. ¶¶ 53, 96.

The cases on which Defendants rely for their argument that they had no disclosure obligation are distinguishable. *See* Def. Br. at 18. In *In re Centerline Holdings Co. Securities Litigation*, the defendants ***had not already elected to speak on the matter***. 613 F. Supp. 2d 394, 401 n.54 (S.D.N.Y. 2009). Here, on the other hand, Defendants made numerous representations about VeraSun's strong liquidity, thus establishing a duty to speak fully and completely. In *In re Northern Telecom Ltd. Securities Litigation*, a summary judgment decision, the defendants allegedly failed to make interim disclosures of quarterly earnings losses and lowered guidance. 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000). There, the Court held that defendants properly announced their quarterly earnings within the time permitted by the SEC. *Id.* In another case with allegations based on the timing of the release of quarterly results, *In re Duane Reade Inc. Securities Litigation*, defendants made "predictive statements of opinion" regarding "future earnings, sales goals and [the Company's] desire to achieve continued prosperity," and later reported a decrease in sales. No. 02-6478, 2003 WL 22801416, at *5 (S.D.N.Y. Nov. 25, 2003). The court held that "there is no obligation to release interim sales data prior to the quarter's end." *Id.* Here, Plaintiffs have not alleged that Defendants failed to timely report earnings or release interim sales data. Instead, Plaintiffs allege that Defendants affirmatively made materially false

and misleading statements regarding VeraSun's liquidity and failed to disclose information necessary to make those statements not misleading. *See*, *e.g.*, ¶¶ 95, 97-98.

### B.     The Complaint Supports a Strong Inference of Scienter

At this stage, a plaintiff demonstrates scienter by alleging facts that either: (1) "constitute strong circumstantial evidence of misbehavior or recklessness," or (2) "show[] that defendants had both motive and opportunity to commit fraud." *Citiline Holdings, Inc. v. iStar Fin., Inc.*, No. 08-3612, 2010 WL 1172647, at *7 (S.D.N.Y. Mar. 26, 2010). The Complaint does both. In challenging the Complaint's scienter allegations, Defendants fail to consider Plaintiffs' scienter allegations *as a whole*. *See Hall*, 580 F. Supp. 2d at 225. Instead, they mischaracterize the allegations and criticize each allegation independently and ask the Court to do the same, contrary to the standards articulated in *Tellabs*. *See* 551 U.S. at 322-23 ("The inquiry . . . is whether *all* of the facts alleged, taken *collectively*, give rise to a strong inference of scienter, *not* whether any individual allegation, scrutinized in isolation, meets that standard.").

### 1.     Defendants Knew or Were Reckless in Not Knowing Their Statements Were False And Misleading

The Complaint includes strong circumstantial evidence that Defendants engaged in "conscious misbehavior or recklessness." *Sadia*, 643 F. Supp. 2d at 527; *see also S. Cherry St.*, 573 F.3d at 109 (collecting cases) ("the scienter element can be satisfied by a strong showing of reckless disregard for the truth"). Under this standard, scienter is adequately pled where a defendant's conduct "is highly unreasonable" in that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Sadia*, 643 F. Supp. 2d at 527.

The Complaint is replete with factual allegations that demonstrate the actual knowledge or reckless disregard of Endres, Herron and Meier as to VeraSun's liquidity situation. *See* ¶¶ 45,

47, 77-80, 86, 89, 91, 94, 98-99, 101. "Such allegations alone are enough to satisfy the pleading requirement for scienter." *Freudenberg v. E\*Trade Fin. Corp.*, No. 08-8538, 2010 WL 1904314, at \*24 (S.D.N.Y. May 11, 2010); *Ellenburg*, 2010 WL 1983375, at \*5. Because of their executive positions and responsibilities and access to material non-public information, the Complaint alleges that Defendants knew that adverse material facts regarding VeraSun's liquidity and financial condition had not been disclosed to VeraSun's investors. Additionally, at the start of the Class Period, the Company was completing the merger with US BioEnergy. ¶ 35. Based on the extensive analysis and due diligence conducted regarding the merger, Defendants were obviously aware of the Company's cash position. ¶ 36.

Furthermore, throughout the Class Period, Defendants had extensive access to – and weekly meetings to discuss – an extraordinary amount of data that contradicted their public representations regarding VeraSun. The Complaint alleges VeraSun prepared daily spreadsheets to reflect trades made by the plant-level grain managers and any margin calls. ¶ 77. Members of the risk management committee, which included Defendants Endres, Herron and Meier, received these daily spreadsheets. ¶¶ 77-78, 80.[20] The risk management committee reviewed the spreadsheets during a conference call each Tuesday morning where VeraSun's current trading and hedge positions (as well as related margin requirements) were discussed. ¶¶ 77-79, 80. Multiple CWs confirm the active participation of Endres, Herron and Meier in these weekly meetings.[21] This is sufficient to allege scienter. *See*, *e.g.*, *Sadia*, 643 F. Supp. 2d at 535 (where,

---

[20] The spreadsheets reflected the accounting department's reconciliation and verification of the trade slips provided by the plant-level grain traders and FC Stone, a commodity risk management and trading company employed by VeraSun. ¶ 77.

[21] *See* ¶ 78 (CW1 confirming participation of Endres, Herron and Meier); ¶ 79 (CW2, who was a predecessor of Meier, confirming the participation of Endres and Herron); ¶ 80 (CW3 confirming the participation of Endres and Herrron).

among other things, "Sadia's Risk Management Committee received reports detailing the Company's hedging activity on a daily basis," the Court found "it is unlikely that Sadia's agents and officers were unaware of the speculative nature of the Company's currency hedging contracts at the time they issued the misstatements").[22]

The Complaint alleges many other examples indicating that Endres, Herron, and Meier knew the extent of the Company's precarious cash position and the lengths to which Defendants went to generate much-needed cash. *E.g.*, ¶ 45 (shifting cash from individual plants onto the corporate balance sheet); *Id.* (holding daily cash flow meetings, which was "highly irregular" for the Company); *Id.* (securing a $125 million credit facility); ¶¶ 52-53 (halting construction of three ethanol refineries); ¶ 50 (identifying assets to sell to generate cash); ¶¶ 56-57 (changing the accounting processes so "net back" revenues would be credited at the corporate, rather than plant level); ¶¶ 42, 55 (stretching out vendor payments); ¶¶ 42, 80 (retaining consultants from AlixPartners in May or June 2008 to advise the Company regarding cash flow projections, collection of receivables and other liquidity issues); ¶ 44 (attempting to sell corn owned by a US BioEnergy plant to raise cash).

Defendants claim that the Complaint fails to allege scienter because "there is no way . . . that Defendants could have known VeraSun's losses by mid-August with any confidence." Def. Br. at 21. This ignores the Complaint's detailed allegations, which establish that Defendants were aware of the massive liquidity problems plaguing VeraSun throughout the Class Period.

---

[22] In the cases cited by Defendants, it was unclear whether the reports at issue even contained information that may have contradicted their public statements. *See In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group Ltd.*, 357 Fed. Appx. 393 (2d Cir. 2009) (no allegation that defendants had access to specific information contrary to their public statements); *In re MBIA, Inc. Sec. Litig.*, No. 08-264, 2010 WL 1253925, at *17 (S.D.N.Y. Mar. 31, 2010) (no allegation that the reports contained data relevant to the alleged misstatements).

*See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) ("absurd to suggest" that directors would not discuss serious reports coming into corporation); *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 938 (N.D. Ill. 1999) (management "may be presumed to have been aware" of pervasive problems at corporation). Even assuming, *arguendo*, that Defendants did not know the full extent of the Company's already locked-in hedging losses by August 12, 2008, this lack of knowledge rises to the level of severe recklessness, given the Company's severe liquidity problems throughout the Class Period and, in particular, the period from mid-July through early-August when it had become clear that the accumulator contracts had locked the Company into buying twice as much corn as it needed at well above-market prices.[23] Even if the actual losses could not be determined with certainty by early August 2008, Defendants were nonetheless obligated to disclose that VeraSun would not have the ability to fund the Company's operations for the next 12 months. Defendants knew these facts no later than August 12, 2008.[24]

Defendants also suggest that VeraSun was the victim of unfavorable economic conditions and Defendants "could not have been expected to anticipate market conditions." Def. Br. at 22. However, Plaintiffs are ***not*** alleging that Defendants failed to disclose market conditions or the

---

[23] Recklessness can be shown by defendants' knowledge of facts or access to information contradicting their public statements. *Hall*, 580 F. Supp. 2d at 227. Under the present facts, Defendants knew or, more importantly, were reckless in not knowing that they were misrepresenting material facts. *See id.*

[24] Indeed, in the Bankruptcy Court proceedings, VeraSun's own counsel confirmed that the "negative stories out there about our liquidity situation . . . were true[.]" ¶ 107. Other statements made in VeraSun's bankruptcy proceedings and post-Class Period SEC filings demonstrate that Defendants knew or were reckless in not knowing that their Class Period statements were materially misleading. *See*, *e.g.*, ¶ 107; ¶ 112 ("I didn't give you the numbers of all of these facilities, but there's a lot of debt."); ¶¶ 108-110; *Freudenberg*, 2010 WL 1904314, at *10 (*citing Lapin*, 506 F. Supp. 2d at 237) ("The Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period."); *In re Vivendi*, 381 F. Supp. 2d at 181 (same).

general economic downturn.  Rather, the Complaint alleges that Defendants embarked on an aggressive growth strategy, disguised the cash crisis that existed at least as early as March 2008 and committed VeraSun to accumulator contracts in order to hide the Company's catastrophic liquidity position, all while misleading investors about these actions and their impact on the Company's liquidity.  Defendants contend it was impossible to know in August "which direction the market would go" (Def. Br. at 22), but by then the accumulator contracts had already locked the Company into significant losses.  Moreover, Defendants already knew that the United States was enjoying a bumper corn crop and as a result corn prices had dropped significantly.  ¶¶ 67, 75-80.  The Company was in such a deep hole that even favorable changes in corn prices in the following weeks were unlikely to reverse the losses due, in part, to the multiplier effect of the accumulator contracts.  In fact, for the quarter ended September 2008, VeraSun attributed $119 million in losses to its ill-fated transactions in corn-related derivatives.  ¶ 109.[25]

Scienter is also supported by the sheer magnitude of VeraSun's $476 million loss for 3Q08 – more than **four times** what the Company had predicted just weeks earlier. ¶ 109.  *See In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 77 (2d Cir. 2001) (magnitude of the alleged falsity strengthens the inference of scienter); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (same); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1235 (N.D. Okla. 2003) (problems were "so large, pervasive and fundamental, that their existence must have

---

[25] The case on which the Defendants rely, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 08-8143, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010), is readily distinguishable.  In *Plumbers & Steamfitters*, "the Complaint ma[de] no reference to internal CIBC documents or confidential sources discrediting Defendants' assertions that they were only adapting to a 'rapidly changing economic landscape' during a 'once-in-a-century credit tsunami.'"  *Id.* at *9.  Here, Plaintiffs are not laying blame for unforeseen or severe market conditions on VeraSun.  The issue is Defendants' failure to disclose to investors the Company's liquidity crisis and the ramifications of the change in hedging policy, which greatly exacerbated the effects of the liquidity crunch.

been known.").

Defendants boldly suggest that it was admirable that they "announced VeraSun's third-quarter losses on September 16, well before the end of the quarter."  Def. Br. at 21.  But, Defendants did so only because it was impossible to continue concealing the truth at this time, as evidenced by the Company's bankruptcy filing made just *six weeks later*.  ¶¶ 82, 106.  This is not a situation where the parties merely disagree about the timing of an announcement, as in the cases cited by Defendants.  Here, material misinformation was disseminated throughout the Class Period until the time when the fraud could no longer be maintained.[26]

### 2.    Defendants Had Motive and Opportunity to Commit Fraud

Defendants were motivated to misrepresent VeraSun's liquidity to maintain the Company's stock price so that the Company could complete the offering announced on August 14, 2008 offering.  *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) ("to inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital" is a sufficient allegation of motive).  The timing of the offering was remarkable: Defendants touted VeraSun as a rapidly-expanding company positioned for outstanding growth, without disclosing *any* risks from VeraSun's precarious liquidity position or recent trading losses just *two days prior* to announcing the offering on August 14, 2008.  ¶¶ 95-101.  Unbeknownst to investors, the failed offering was a last-ditch effort to raise cash to cover the huge losses incurred by the accumulator contracts.  ¶¶ 100-101.  Thus, the highly suspicious timing of the offering announced on August 14 supports an inference of scienter.  *See id.*

---

[26] *See Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) ("[T]he defendants recklessly attempted to sweep the problem under the rug hoping a change in the economy would ameliorate the problem.").

The absence of insider trading does not preclude an inference of scienter.[27]  Despite this, Defendants argue that it means they had no motive.  Def. Br. at 20.  However, defendant Endres owned stock which was restricted for 180 days after the US BioEnergy merger, *i.e.*, until September 28, 2008.[28]  Thus, Endres had a reason to keep the Company afloat through at least September so he could sell his restricted stock.  This is clear motive and, combined with the Complaint's other allegations, creates a strong inference of scienter.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 654-55 (S.D.N.Y. 2007) (finding motive where restricted stock "would become worthless were the fraud exposed").

### C.   Allegations Based on Information from Confidential Witnesses Bolster the Inference of Scienter

For each of the 12 CWs identified, the Complaint alleges each person's specific role and how he or she was in a position to know the information provided.  *See*, *e.g.*, ¶¶ 42, 44-46, 50, 54, 65, 70-71, 79-80.  "The fact that this case involves [c]orroboration from multiple sources . . . [that] emanate from several geographic areas and span different levels of the Company hierarchy" supports an inference of a scienter.  *Freudenberg*, 2010 WL 1904314, at *23.

Defendants' objections to specific CWs lack merit.  For instance, they challenge the knowledge of CW5 and CW7 because they "worked at US BioEnergy, an independent company that first began to integrate with VeraSun after the March 31 merger."  Def. Br. at 23-24. However, Defendants fail to mention that these witnesses also worked for VeraSun ***following*** the

---

[27] *See*, *e.g.*, *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) ("absence of insider trading does not preclude an inference of scienter, especially where the plaintiff alleges that the defendant stood to benefit from the alleged fraud"); *Bristol Myers*, 586 F. Supp. 2d at 169 (finding motive absent insider trading).

[28] *See* Bongiorno Decl., Ex. 2 at 29.

merger and during the period about which they provided information.[29]   Thus, contrary to Defendants' assertion, both CW5 and CW7 necessarily became familiar with VeraSun's accounting practices and collection of cash from the plants due to their positions within the post-merger company.[30]   Defendants also argue that Plaintiffs "cannot support their allegation that VeraSun hired a bankruptcy consultant in May 2008."   Def. Br. at 24.   However, the allegations, based on information received from CW1, speak for themselves and the Defendants offer no valid reason to question these allegations.[31]

Defendants further claim that the "opinions" of CWs and persons other than the Defendants "are simply irrelevant."   Def. Br. at 24.   However, in the paragraphs cited by the Defendants, the CWs are recounting facts about events in which they were involved, which cannot be said to reflect "opinions."   *See* Def. Br. at 24 (*citing* ¶¶ 46, 50, 54, 63, 65, 68-72). Even where these paragraphs do not specifically identify Defendants, they provide additional context regarding VeraSun's dire financial condition, thereby supporting the inference that

---

[29] CW5 was a Plant Accounting Manager at several VeraSun plants, including the Ord, Nebraska plant.   ¶ 45.   CW7, who was Treasurer of US BioEnergy prior to the merger, also continued to work for VeraSun through July 31, 2008.   ¶ 44.

[30] Furthermore, Defendants erroneously claim that statements from the CWs are "sometimes inconsistent."   Def. Br. at 24.   Their sole example of a purported contradiction results from an incorrect paraphrase of the Complaint.   CW12 did ***not*** state that "accumulators cannot be hedged," as Defendants claim.   Def. Br. at 24.   Instead, CW12 indicated that accumulators are "not easily off-set by a hedge" (¶ 70), which in no way contradicts CW4's statement that "[t]he company simply did not have the cash to protect and hedge the accumulator contracts as it should have" (¶ 69).

[31] CW1, who was the Assistant Controller at VeraSun, stated that "in the May-June 2008 timeframe, I remember that there were specific consultants from AlixPartners that were on premises assisting with [VeraSun's] cash flow projections and management."   ¶ 42.   CW1 indicated that "[t]his was at the same time that other liquidity issues became apparent at VeraSun, such as slowing up our payables and using outside consultants to be more aggressive with the collection of receivables."   *Id.*   CW1 stated that "when [VeraSun] went into bankruptcy at the end of October 2008, I noted that the same people from AlixPartners I saw in May-June 2008 [that were] assisting with our cash flow were also now our bankruptcy consultants."   *Id.*

Defendants acted with scienter.  *Tellabs*, 551 U.S. at 322.  Indeed, the Second Circuit has consistently held that circumstantial evidence of a defendant's conscious misbehavior or recklessness is appropriate to allege scienter.  *See*, *e.g.*, *Ganino*, 228 F.3d at 168-69.[32]  The Complaint, therefore, contains compelling and properly pleaded allegations based on information received from the 12 CWs.

Additionally, Defendants do not dispute that they had "control" over VeraSun.  *See* Def. Br. at 25.  Thus, having adequately pled primary violations of Section 10(b), Plaintiffs also adequately state a Section 20(a) claim against Defendants.  *See Hall*, 580 F. Supp. 2d at 235.

## V.   CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety, allowing this case to proceed to discovery.[33]

---

[32] Defendants rely on *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004), but that case stands for the unremarkable position that the PSLRA requires that scienter be alleged as to each defendant.  *In re Cerner Corp. Securities Litigation* is also distinguishable because, unlike here, the allegation in question "sheds no light on the relevant issue."  425 F.3d 1079, 1086 (8th Cir. 2005).

[33] Should the Court find that the Complaint does not adequately plead the elements of a Securities Exchange Act claim, Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15(a).  *See also In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 387-88 (S.D.N.Y. 2007) ("Whether to permit a plaintiff to amend his pleadings is a matter committed to the Court's sound discretion.  Rule 15(a) provides that leave to amend a complaint shall be freely given when justice so requires.  Moreover, [i]t is the usual practice upon granting a motion to dismiss to allow leave to replead. [A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated.").

Dated:  June 14, 2010                    Respectfully submitted,

                                         COHEN MILSTEIN SELLERS & TOLL, PLLC

                                         By:  /s/ Christopher Lometti
                                         Christopher Lometti (clometti@cohenmilstein.com)
                                         Daniel B. Rehns (drehns@cohenmilstein.com)
                                         Kenneth M. Rehns (krehns@cohenmilstein.com)
                                         150 East 52nd Street, 30th Floor
                                         New York, NY 10022
                                         Telephone: (212) 838-7797
                                         Facsimile: (212) 838-7745

                                         *Liaison Counsel for Lead Plaintiffs and the Class*

                                         GOLD BENNETT CERA & SIDENER LLP
                                         Solomon B. Cera (scera@gbcslaw.com)
                                         Gwendolyn R. Giblin (ggiblin@gbcslaw.com)
                                         Thomas C. Bright (tbright@gbcslaw.com)
                                         595 Market Street, Suite 2300
                                         San Francisco, CA 94105
                                         Telephone: (415) 777-2230
                                         Facsimile: (415) 777-5189

                                         BARROWAY TOPAZ KESSLER
                                           MELTZER & CHECK LLP
                                         Michael K. Yarnoff (myarnoff@btkmc.com)
                                         Neena Verma (nverma@btkmc.com)
                                         280 King of Prussia Road
                                         Radnor, PA 19087
                                         Telephone: (610) 667-7706
                                         Facsimile: (610) 667-7056

                                         and

                                         Nichole Browning (nbrowning@btkmc.com)
                                         Erik Peterson (epeterson@btkmc.com)
                                         580 California Street, Suite 1750
                                         San Francisco, CA 94104
                                         Telephone: (415) 400-3000
                                         Facsimile: (415) 400-3001

                                         *Co-Lead Counsel for Lead Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth M. Rehns, hereby certify that on June 14, 2010, I caused the foregoing document to be filed electronically with the United States District Court for the Southern District of New York through the Court's mandated ECF service.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

<u>/s/  Kenneth M. Rehns      </u>
Kenneth M. Rehns